# UTAH *v.* UNITED STATES

No. 31, Orig.   Argued April 26, 1971—Decided June 7, 1971

DOUGLAS, J., delivered the opinion of the Court, in which all members joined except MARSHALL, J., who took no part in the consideration or decision of the case.

*Dallin W. Jensen,* Assistant Attorney General of Utah, argued for plaintiff in support of the Report of the Special Master.   With him on the briefs were *Vernon B. Romney,* Attorney General, *Robert B. Hansen,* Deputy Attorney General, *Paul E. Reimann,* Assistant Attorney General, and *Clifford L. Ashton* and *Edward W. Clyde,* Special Assistant Attorneys General.

*Peter L. Strauss* argued for the United States on exceptions to the Report of the Special Master.   On the brief were *Solicitor General Griswold, Assistant Attorney General Kashiwa, Louis F. Claiborne,* and *Martin Green.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This suit was initiated by Utah to resolve a dispute between it and the United States as to shorelands around the Great Salt Lake.   Utah's claim to the lands is premised on the navigability of the lake at the date of

statehood, *viz.,* January 4, 1896. If indeed the lake were navigable at that time, the claim of Utah would override any claim of the United States, with the possible exception of a claim based on the doctrine of reliction, not now before us.

The operation of the "equal footing" principle has accorded newly admitted States the same property interests in submerged lands as was enjoyed by the Thirteen Original States as successors to the British Crown. *Pollard's Lessee* v. *Hagan,* 3 How. 212, 222–223, 228–230. That means that Utah's claim to the original bed of the Great Salt Lake—whether now submerged or exposed—ultimately rests on whether the lake was navigable (*Martin* v. *Waddell,* 16 Pet. 367, 410, 416–417) at the time of Utah's admission. *Shively* v. *Bowlby,* 152 U. S. 1, 26–28. It was to that issue that we directed the Special Master, Hon. J. Cullen Ganey, to address himself. See *Utah* v. *United States,* 394 U. S. 89. In the present report the Special Master found that at the time in question the Great Salt Lake was navigable. We approve that finding.

The question of navigability is a federal question. *The Daniel Ball,* 10 Wall. 557, 563. Moreover, the fact that the Great Salt Lake is not part of a navigable interstate or international commercial highway in no way interferes with the principle of public ownership of its bed. *United States* v. *Utah,* 283 U. S. 64, 75; *United States* v. *Oregon,* 295 U. S. 1, 14. The test of navigability of waters was stated in *The Daniel Ball, supra,* at 563:

> "Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. . . ."

While that statement was addressed to the navigability of "rivers" it applies to all water courses. *United States v. Oregon, supra,* at 14.

The United States strongly contests the finding of the Special Master that the Great Salt Lake was navigable. Although the evidence is not extensive, we think it is sufficient to sustain the findings. There were, for example, nine boats used from time to time to haul cattle and sheep from the mainland to one of the islands or from one of the islands to the mainland. The hauling apparently was done by the owners of the livestock, not by a carrier for the purpose of making money. Hence it is suggested that this was not the use of the lake as a navigable highway in the customary sense of the word. That is to say, the business of the boats was ranching and not carrying water-borne freight. We think that is an‘ irrelevant detail. The lake was used as a highway and that is the gist of the federal test.

It is suggested that the carriage was also limited in the sense of serving only the few people who performed ranching operations along the shores of the lake. But that again does not detract from the basic finding that the lake served as a highway and it is that feature that distinguishes between navigability and non-navigability.

There was, in addition to the boats used by ranchers, one boat used by an outsider who carried sheep to an island for the owners of the sheep. It is said that one sheep boat for hire does not make an artery for commerce; but one sheep boat for hire is in keeping with the theme of actual navigability of the waters of the lake in earlier years.

There was, in addition, a boat known as the *City of Corinne* which was launched in May 1871 for the purpose of carrying passengers and freight; but its life in that capacity apparently lasted less than a year. In 1872 it

was converted into an excursion boat which apparently plied the waters of the lake until 1881. There are other boats that hauled sheep to and from an island in the lake and also hauled ore, and salt, and cedar posts. Still another boat was used to carry salt from various salt works around the lake to a railroad connection.

The United States says the trade conducted by these various vessels was sporadic and their careers were short. It is true that most of the traffic which we have mentioned took place in the 1880's, while Utah became a State in 1896. Moreover, it is said that the level of the lake had so changed by 1896 that navigation was not practical. The Master's Report effectively refutes that contention. It says that on January 4, 1896, the lake was 30.2 feet deep. He finds that on that date "the Lake was physically capable of being used in its ordinary condition as a highway for floating and affording passage to water craft in the manner over which trade and travel was or might be conducted in the customary modes of travel on water at that time." He found that the lake on January 4, 1896, "could have floated and afforded passage to large boats, barges and similar craft currently in general use on inland navigable bodies of water in the United States." He found that the areas of the lake that had a depth sufficient for navigation "were several miles wide, extending substantially through the length and width of the Lake."

Most of the history of actual water transportation, to be sure, took place on the lake in the 1880's, yet the findings of the Master are that the water conditions which obtained on January 4, 1896, still permitted navigation at that time.

In sum, it is clear that Utah is entitled to the decree for which it asks. The Special Master has submitted with his report a proposed decree which we attach as an Appendix to this opinion. We invite the parties to

address themselves to that decree with-the view of agreeing, if possible, upon the issues which have now been settled by this litigation.

*So ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

## APPENDIX TO OPINION OF THE COURT

IT IS ORDERED, ADJUDGED AND DECREED THAT:

1. The United States of America, its departments and agencies, are enjoined, subject to any regulations which the Congress may impose in the interest of navigation or pollution control, from asserting against the State of Utah any claim of right, title and interest:

(a) to the bed of the Great Salt Lake lying below the meander line of Great Salt Lake as duly surveyed heretofore or in accordance with Section 1 of the Act of June 3, 1966, 80 Stat. 192, with the exception of any lands within the Bear River Migratory Bird Refuge and the Weber Basin federal reclamation project,

(b) to the natural resources and living organisms in or beneath the bed of the Great Salt Lake as delineated in (a) above, and

(c) to the natural resources and living organisms either within the waters of the Great Salt Lake, or extracted therefrom, lying below the meander line of the Great Salt Lake, as delineated in (a) above, except brine and minerals in solution in the brine or precipitated or extracted therefrom in whatever federal lands there may be below said meander line, together with the right to prospect for, mine, and remove the same, as set forth in Section 3 of the Act of June 3, 1966, 80 Stat. 192.

2. The State of Utah is not required to pay the United States, through the Secretary of the Interior, for the lands, including any minerals, lying below the meander line of the Great Salt Lake, as delineated in 1 (a), above, of this decree.

3. The prayer of the United States of America in its Answer to the State of Utah's Complaint that this Court "confirm, declare and establish that the United States is the owner of all right, title and interest in all the lands described in Section 2 of the Act of June 3, 1966, 80 Stat. 192, as amended by the Act of August 23, 1966, 80 Stat. 349, and that the State of Utah is without any right, title or interest in such lands, save for the right to have these lands conveyed to it by the United States, and to pay for them, in accordance with the provisions of the Act of June 3, 1966, as amended," is denied.

Respectfully submitted,

J. CULLEN GANEY,
*Senior Circuit Judge,*
*Special Master.*