PIGORSH v FAHNER

OPINION OF THE COURT

1. COURTS—STARE DECISIS—PROPERTY RIGHTS—PRECEDENTS.

   *Stare decisis* is not limited to precedents involving property rights and although courts are not compelled to follow so-called "rules of property" the doctrine is more strictly followed where property rights, especially rights in real property, are concerned and where rights have become vested in reliance on the precedents.

2. WATERS AND WATER COURSES—INLAND LAKES—SUBAQUEOUS LAND —NAVIGABLE WATERS.

   One who is owner in fee of all of the upland surrounding one of Michigan's wholly private inland lakes, a lake having

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 20 Am Jur 2d, Courts § 196.
[2-4, 23] 56 Am Jur, Waters § 51.
   Title to beds of natural lakes or ponds. 23 ALR 757 s. 112 ALR 1108.
[5, 6, 9, 14, 15, 19, 20] 58 Am Jur, Waters § 178 *et seq.*
[7] 58 Am Jur, Waters § 207 *et seq.*
[8] 58 Am Jur, Waters § 3.
[10-13] 58 Am Jur, Waters §§ 51, 54.
[16] 58 Am Jur, Waters §§ 216, 273 *et seq.*
[17, 21] 58 Am Jur, Waters § 216.
   Rights, privileges, or easements of public, its grantees or licensees, on land bordering on navigable water. 53 ALR 1191.
[18] 58 Am Jur, Waters § 188.
[22] 58 Am Jur, Waters §§ 274, 405 *et seq.*

no navigable inlet and no navigable outlet, really owns the subaqueous land of the lake and the water over the latter as well as the upland, and his property right is such that he may exclude all others from the lake, the general public included; the size of the lake matters not nor does it matter that such a wholly private lake is navigable in fact.

3. WATERS AND WATER COURSES—INLAND LAKES—STATUTES—CONSTITUTIONAL LAW.

Inland Lakes and Streams Act of 1965, if construed and applied to abrogate the rule of property that one who is owner in fee of all the upland surrounding a private inland lake, having no navigable inlet and outlet, really owns the subaqueous land of the lake and the water over the latter as well as the upland, and his property right is such that he may exclude all others from the lake, the general public included, would collide with and fall before the constitutional provision that private property may not be taken without just compensation (Const 1963, art 10, § 2; MCLA 281.731 *et seq.*).

### CONCURRING OPINION

### BLACK, J.

See headnotes 1–3.

4. INJUNCTION—INLAND LAKES—TRESPASS.

*Plaintiff owners of a lake and all the riparian environs thereof, to which the public has no lawful right of access, are entitled to injunctive relief against the continuing trespass all defendants have threatened.*

### DISSENTING OPINION

### T. E. BRENNAN, J.

5. NAVIGABLE WATERS—RIVERS—STREAMS—LAKES—NAVIGABLE IN FACT—NAVIGABLE IN LAW.

*Rivers, streams, and lakes which are navigable in fact are navigable in law.*

6. NAVIGABLE WATERS—WATERS AND WATER COURSES.

*A water course when navigable remains so even after the public convenience and necessity giving rise to its appropriation as a highway ceases.*

7. Navigable Waters—Waters and Water Courses—Public Waters—Public Rights.

> The public has certain rights in navigable waters which are incident to their status as public waters and these rights abide, even after the initial commercial use has long since lapsed and even though the incidental public rights, standing alone, might not have sufficed to warrant a declaration of navigability in the first instance.

8. Words and Phrases—Inland Lakes—Waters and Water Courses

> "Inland lake" means any lake other than the Great Lakes, located completely within the State of Michigan.

9. Navigable Waters—Inland Lakes.

> Certain factors, which have seemed to bear on navigability as to inland lakes, are: meander line; inlet and outlet; public access; boatability; prior commercial use; size.

10. Waters and Water Courses—Meander Line—Inland Lakes—Land Patents.

> A meander line is simply a surveyor's line and, when used in connection with inland lakes, it refers to a line run by the government land office surveys, upon which titles to Michigan real estate were originally patented to individual owners by the United States.

11. Boundaries—Meander Line.

> Michigan does not regard a meander line as a boundary; meander lines were merely a means of computing the acreage in the uplands.

12. Waters and Water Courses—Littoral Owners—Riparian Owners—Subaqueous Lands—Meandered Lakes—Boundaries—Bottom Land.

> That littoral or riparian owners take title to subaqueous lands is too well settled at this point in time to question; the only distinction between meandered and nonmeandered lakes being that in the former, the riparian owners take title to the center of the lake along pie-shaped extensions of their shoreline boundaries—while in the latter case, the riparian owner takes title only to the bottom land lying within the description conveyed to him.

13. Navigable Waters—Meander Line.

> The existence of a meander line has not been regarded as conclusive of navigability; in fact, it seems to have little bearing on the question.

14. NAVIGABLE WATERS—NAVIGABLE OUTLET—NAVIGABLE INLET—INLAND LAKES—BOATABILITY.

> *Outlet and inlet are very important, at least from the standpoint of an affirmative finding of navigability as, if an inland lake has a navigable inlet or outlet, and if the lake itself is passable or boatable, it seems obvious that the lake forms a part of the aquatic highway and is navigable.*

15. NAVIGABLE WATERS—FISH—CONSERVATION LAWS—LAND RIGHTS.

> *Movement of fish has never been the basis of a holding of navigability; the state, under the conservation laws, can stock private waters with fish without the consent of the owner but fish planting can hardly be made the basis of determining rights in land.*

16. WATERS AND WATER COURSES—RIPARIAN OWNER—LICENSEES—LAKES—NAVIGABLE WATERS—PUBLIC ACCESS.

> *The right of every riparian owner to permit limitless numbers of licensees to go upon the whole lake, irrespective of the proportion of his shoreline ownership is undisputed but this does not change the character of the lake as, if the lake is inherently a navigable body of water, he merely makes its use by the public more convenient or possible without antecedent trespass or license from some other littoral owner and if the lake is not inherently a navigable body of water, he does not make it so by providing access to the public.*

17. TRESPASS—PRIVATE LANDS—NAVIGABLE WATERS.

> *The public has no right to trespass upon privately owned uplands or fast lands; but in navigable waters, antecedent trespass as a means of access will not render the boater, or fisherman a continuing trespasser, once he has entered the water.*

18. NAVIGABLE WATERS — BOATABILITY — FLOATABILITY — INLAND LAKES.

> *Boatability, or floatability is obviously an essential factor in determining the navigability of an inland lake and, whatever other factors must be present, an inland lake must be boatable to be navigable.*

19. NAVIGABLE WATERS—INLAND LAKES—SIZE OF LAKE.

> *The factor most reliable in determining the navigability of inland lakes is size.*

20. Navigable Waters—Inland Lakes—Size of Lake—Natural Lakes—Boatability—Public Rights.

*Classification of navigability of inland lakes between those of less and those of more than ten acres has sufficient basis in history and reason to warrant application in Michigan; that measure recognizes that 5,466 of Michigan's 7,661 inland lakes are of such size that, assuming they are natural bodies and conceding a boatable surface, they constitute the substance of the recreational and navigational heritage of all of the people of the state, to be preserved and maintained against pollution, destruction, impairment or expropriation for private gain to the exclusion of public right.*

21. Navigable Waters—Trespass—Public Access.

*Navigability alone does not invite any right of free public access; trespass upon adjoining uplands has never been and is not now permitted under Michigan law.*

22. Navigable Waters—Inland Lakes—Inchoate Public Trust.

*A navigable inland lake, even though all of its shoreline and its bottom land be owned by a single private proprietor, is nonetheless impressed with an inchoate public trust, and it may no more be polluted or destroyed than the air above it.*

23. Navigable Waters—Waters and Water Courses—Inland Lakes and Streams Act—Injunction.

*The Inland Lakes and Streams Act applies to the waters of Wood Lake, a natural body of water comprising approximately 70 acres which has no inlet and no outlet and is entirely surrounded by plaintiffs' property, and an appropriate mandatory injunction should be entered for the removal of plaintiffs' unlawful partial filling thereof (MCLA 281.731 et seq.)*

Appeal from Court of Appeals, Division 3, J. H. Gillis, P. J., and R. B. Burns and V. J. Brennan, JJ., affirming Montcalm, William R. Peterson, J. Submitted May 6, 1971. (No. 27 April Term 1971, Docket No. 52,822.) Decided February 25, 1972.

22 Mich App 108 affirmed.

Complaint by Walter G. Pigorsh, Ruth Pigorsh, James H. McMullen and Doris G. McMullen against Sheldon Fahner, August Bradley, Harry Carlson,

Ben Wall, and the Township Board of Township of
Pierson to enjoin trespassing on the lands of plain-
tiffs and injuring plaintiffs' property. The Con-
servation Department of the State of Michigan
intervened as defendant and cross-claimed to re-
strain plaintiffs from further construction of a
barrier on their property and to require removal
thereof. Judgment for plaintiffs. Defendant Con-
servation Department appealed to the Court of
Appeals. Affirmed. Defendant Conservation De-
partment appeals. Affirmed.

*Boyles & Van Orden,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A.
Derengoski,* Solicitor General, and *Jerome Mas-
lowski,* Assistant Attorney General, for defendant
Conservation Department.

PER CURIAM. Upon leave granted (383 Mich 795)
we review and affirm the respective judgments of
the circuit court and of the Court of Appeals. For
those judgments and the presently mentioned fac-
tual findings of both courts, see 22 Mich App 108.

Decisions establishing the "rule of property"[1]
which of right control disposition of this case were
gathered in *Putnam* v *Kinney,* 248 Mich 410 (1929).
*Putnam* is "on all fours" here. These decisions go
back to the simple proposition that one who is owner

---

[1] "§ 196. *Property rights.*

"Although stare decisis is not limited to precedents involving prop-
erty rights, and although courts are not compelled to follow so-called
'rules of property,' the doctrine of stare decisis is more strictly
followed where property rights, especially rights in real property, are
concerned and where rights have become vested in reliance on the
precedents." (20 Am Jur 2d, Courts, pp 531, 532).

This of course is the Michigan rule. *Lewis* v *Sheldon,* 103 Mich
102, 103 (1894); *Pleasant Lake Hills Corp* v *Eppinger,* 235 Mich
174 (1926); *Dolby* v *State Highway Commissioner,* 283 Mich 609,
615 (1938).

in fee of *all* of the upland surrounding one of our wholly private inland lakes, a lake having no navigable inlet and no navigable outlet, (a) really owns the subaqueous land of the lake and the water over the latter as well as the upland, and (b) that his property right is such that he may exclude all others from the lake, the general public included. All this cannot be gainsaid, nor is it denied. As against the successive and fully supported factual findings below the Attorney General responds simply that plaintiffs' Wood Lake is at least navigable in fact and that the "Inland Lakes and Streams Act" of 1965 (No 291 [MCLA 281.731 *et seq.;* MSA 11.451 *et seq.*] amended since institution of this litigation by 1968 PA 7), with its declared applicability to "any navigable inland lake or stream," has abrogated *Putnam's* rule of property.

Our holding is that the act of 1965, so construed and applied, would collide with and fall before § 2 of article 10 of our Constitution. Guided by a familiar rule, we prefer to impute to the legislature an absence of intention to take in such manner private property "without just compensation therefor". The applicable rule of construction appeared first in *Van Fleet* v *Van Fleet,* 49 Mich 610 (1883) and will be found echoed in a consistent list of cases appearing as §§ 117 and 118 of 16 Callaghan's Michigan Digest, Statutes, pp 499–502 and 1971 Cum Supp at pp 166–167.[2]

---

2 "We cannot properly hold that the Legislature designed to commit such an act of injustice as to take away vested rights and destroy valuable existing interests. We are bound, if possible, so to construe statutes as to give them validity and a reasonable operation." (Justice CAMPBELL, writing in *Van Fleet* at 613.)

"In the construction of statutes courts should lean towards that construction which will give the statute force, validity, not to that construction which will nullify it." (Justice FELLOWS, writing for the Court in *Thomas Canning Co* v *Southern Pacific Co,* 219 Mich 388, 400 [1922]).

The size of Wood Lake (74 area acres) matters
not. Nor does it matter that such a wholly private
lake is navigable in fact. The stated rule of prop-
erty applies to a privately owned inland lake as
large as six mile long Lake St. Helen (*St. Helen
Shooting Club* v *Mogle*, 234 Mich 60 [1926]) and
extends to one smaller than Wood Lake, such as
20–25 acre Giddings Lake (*Giddings* v *Rogalewski*,
192 Mich 319 [1916]).

Two ably considered and visibly painstaking
opinions of this case were prepared and filed below.
The first was written by Circuit Judge Peterson,
sitting in the 8th circuit, wherein Wood Lake is
situated. The other was prepared by Court of Ap-
peals Judge V. J. Brennan, for Division 3. The
contemplative and discerning reader of Judge Pe-
terson's opinion, consisting as it does of 28 printed
pages, and then of the fully consistent and equally
level-headed opinion of Division 3, can but conclude
that each of the courts below stands for sturdy
adherence to the necessary stability of property law
and for the due protection of plaintiffs' vested and
mature property right.

Affirmed. Costs of all courts to plaintiffs.

T. M. Kavanagh, C. J., and Black, Adams, T. G.
Kavanagh, and Swainson, JJ., concurred.

Williams, J., concurred in the result.

Black, J. (*concurring*). My endorsement attests
full agreement with the Court's opinion *per curiam*.
A compendium should be added, however, lest im-
pression remain that we have not considered care-
fully the enormity of the Attorney General's posi-
tion that natural and altogether privately owned
Wood Lake, being navigable in fact, should by force

of the statute (1965 PA 291) be opened to public use.

By the aforesaid opinion we reaffirm and reapply a settled rule of property law. The plaintiff owners of Wood Lake and all of the riparian environs thereof, to which the public has no lawful right of access, are upon this plain and factually ascertained record entitled—as in *Giddings* and *Putnam*[1]—to injunctive relief against the continuing trespass all defendants have threatened.

No thought seems to have been given, by the appellant Department of Natural Resources and the Attorney General, to the property-destructive consequences they would have us visit upon the plaintiff landowners. Let the public have access to Wood Lake, by the private roadway that leads westerly some 1500 feet from US 131 and ends at the lakeside home of Mr. and Mrs. McMullen, and the ear-splitting roar of racing outboard motors in summer and of snowmobile motors in winter is bound to replace the utter quiet of plaintiff's picturesque sylvan retreat.[2] The photographed littering shown around the testimonially described "landing" will in short order extend predictably to all of the beaches and wooded shores of the lake. Trespasses and pollutional deposits upon the fast land around the lake will be beyond all practical control. The lake will no longer be owned in fact by the plaintiffs but will instead have become a place of invitational public recreation with no compensation provided for the constitutionally unlawful usurpation of plaintiffs' private rights.

---

[1] *Putnam v Kinney*, 248 Mich 410 (1929); *Giddings v Rogalewski* 192 Mich 319 (1916).

[2] The lake extends roughly from east to west and is approximately 3500 feet long by about 1200 feet wide. According to an old conservation record shown in evidence its average depth is 35 feet. Substantially elliptical in shape, it is just right for a laid out one mile course of winter and summer motorized racing.

The appellant department suggests no means whereby plaintiffs' continuing obligation to pay ever-burgeoning taxes upon their entire freehold will be relieved, in any minimal or substantial way, on account of the proposed partial destruction of their right to the exclusive enjoyment of that which they have acquired. In sum, what the appellant department proposes is that this Court by force only of the mentioned statute should authorize the uncompensated takeover for public use of plaintiffs' privately owned lake and the shores thereof. I cannot subscribe, our country as yet not having gone collectivist or wholly socialistic.

T. E. BRENNAN, J. (*dissenting*). In the posture of this case, we have a very narrow issue to decide, which would be completely moot but for the important implications for the future development of our state and the preservation and enjoyment of Michigan's unique bounty of inland lakes.

Plaintiffs are owners of land in Pierson Township, Montcalm County. Located upon, and entirely surrounded by plaintiffs' property is a natural body of water known as "Wood Lake", comprising approximately 70 acres. The lake has no inlet and no outlet.

Wood Lake is meandered, a survey line having been run around the lake by the government land office in 1837. The meander line defined the size of the government lots around the lake. Plaintiffs' titles are traced to government lots.

On the northeasterly end of the lake, a road some 1500 feet in length runs from US–131 to the McMullen home on the north shore of the lake.

At one point, this road, known as the McMullen Road or as Wood Lake Road, parallels, and comes rather close to the shore of the lake. For some

years, persons in the vicinity used this place as an access to the lake.

Prior to the commencement of this action, plaintiffs erected a fence between the lake and the road. Some of the defendants cut the fence, and continued to use the road as access to the lake. After commencement of this action, plaintiffs filled in part of the bed of the lake at the point where the road was closest thereto.

Intervening defendant, Conservation Department, then sought, via cross-complaint, the removal of the fill, no permit therefor having been issued under 1965 PA 291 (MCLA 281.731 *et seq.;* MSA 11.451 *et seq.*)

At the trial, the circuit judge ruled that defendants were precluded from showing that Wood Lake Road was a public highway by user. This exclusion was premised upon defendants' failure to deny demands for admissions submitted under GCR 1963, 312. Although a separate record was made, we find no need to review it. There is no claim of error in the trial court's exclusionary ruling, and we find none.

Thus, we consider this case upon the premise that Wood Lake Road is not a public road.

Moreover, we are satisfied that there was no error in the holding of the courts below that no prescriptive easement has been established, by which the public have gained a right of access to Wood Lake.

The issue then, is narrow. It is framed by the statute—Act 291 of 1965, called the *Inland Lakes and Streams Act*—and by the word *navigable* as it appears in that act.

Is Wood Lake a navigable lake?

Much has been written in our reports on the subject of navigability. Most of it has been in connection with the status of rivers and streams.

Definitions of navigability have been stated and tests have been formulated in various words.

Navigable waters have been said to be public waters. It has been said that navigable waters are impressed with a public trust, or burdened with a servitude in favor of public navigation.

Navigable waters have been compared to public highways. Indeed it has been said that navigable waters are public highways.

The Northwest Ordinance of 1787, by which the territory which includes Michigan was organized and held bound to the original 13 colonies, contained a provision that the navigable waters leading to the Mississippi and St. Lawrence Rivers and the carrying places between them were public highways and should forever remain free.

It has often been observed in our cases that at the common law only tidewaters were held navigable by law, while some fresh waters in which the tide did not ebb and flow were by long custom and usage regarded as public thoroughfares, and held to be navigable in fact.

In American jurisprudence, the distinction between navigable in law and navigable in fact has never been observed. In our state there are no tidewaters. We have often held that rivers, streams, and lakes which are navigable in fact are navigable in law.

The test for navigability in fact, in the early cases, at least, was not the English test of custom and usage. Our state was in the process of being settled. Its commerce and industry were just beginning. Prior use as a highway could hardly be the measure of navigability.

Wisely, our courts wrote flexible standards, leaving the needs and enterprise of the people to define those waters which were of public utility.

One result of the flexibility of our standards has been that some have observed that there are now two kinds of navigability in Michigan: "strict" navigability, sometimes called "commercial" navigability—encompassing those waters in which a vessel of 15 tons burden can be floated and used for transportation of valuable cargo, and: limited or qualified navigability, sometimes called valuable floatation.[1]

These latter cases developed during the lumber rush days in our state, when some very shallow, otherwise impassable streams were used as great highways of commerce upon which especially in the spring freshet, millions of board feet of lumber were transported to market.

The log floatation test was sheer judicial pragmatism; it weighed the value of the lumbering industry to this state and its people.[2] It declared the public convenience and necessity. Analogies to English cases were purely speculative. No at-

---

[1] Bartke, *Navigability in Michigan in Retrospect and Prospect,* 16 Wayne L Rev 409 (1970).

[2] In *Moore v Sanborne,* 2 Mich 520, 524 (1853), the Court said:

"We have a large territory yet undeveloped, rich in forest and in mineral wealth—washed by vast bodies of water upon three sides, and threaded by innumerable streams which are capable of navigation, many of which are, and many others of which may be made serviceable in developing its resources—and with a commerce already established, rivaling in extent, that of some of the Atlantic States, and rapidly growing under the influence of increasing population, settlements, and wealth, it is of the first importance that the rights of the public be recognized, to the free use of all streams susceptible of any valuable floatage. In this commerce, our lumbering interests sustain, and will continue to sustain an important part, and their success depends to a vast, if not entire extent, upon this principle. Indeed, a moment's reflection will convince us that a liberal application and retention of the common law rule, and its adaptation to our condition and wants, lies at the bottom of this branch of our trade. Although in some of the States usage and custom has been regarded as the foundation of this public right in fresh rivers, yet, in others the application of this doctrine has been denied. In the new States, from necessity, and the very nature of things, such cannot be the foundation of the public right."

tempt was made to delineate navigability in the log-floatation sense, except in terms of actual use.

No one ever said that such a stream was navigable only when timber stood on the banks of its upper reaches and a mill was waiting downstream.

Still it was not the naked capability of floating a log which made such streams navigable. It was rather their actual use for moving logs to market which determined the character of the stream.

And when a watercourse is navigable, it remains so, even after the public convenience and necessity giving rise to its appropriation as a highway ceases.

The other side of that proposition is that the public have certain rights in navigable waters which are incident to their status as public waters, and these rights abide, even after the initial commercial use has long since lapsed, and even though the incidental public rights, standing alone, might not have sufficed to warrant a declaration of navigability in the first instance.[3]

So it is that the logging boom which depleted our virgin forests, left another legacy; miles of old logging streams, historically navigable and subservient to the public use as recreational waters.[4]

This fact, coupled with almost 2000 miles of shoreline upon the Great Lakes and still other thousands of acres of inland lakes, has made our state truly the "water wonderland". The recreational attractions of our waters have been the largest single factor in bringing tourism to the place of Michigan's second most important industry.

It is against this background that we consider the navigability of our inland lakes.

---

[3] *Attorney General, ex rel Director of Conservation,* v *Taggart,* 306 Mich 432 (1943).
[4] For a vivid description of Michigan recreational waters, see dissent of MORSE, J. in *Sterling* v *Jackson,* 69 Mich 488 (1888).

If this sounds pragmatic, we mean it to be so. But pragmatism is not to be confused with short-sightedness. The protection and promotion of our commerce and industry upon the water is not distinct from the conservation of the waters themselves.

Especially is this true when the industry under discussion is recreational. Polluted water is no asset to the tourist industry.

What we need for prosperity in the decades ahead and for survival in the centuries beyond is precisely the same thing: clean, fresh, cool water—and plenty of it.

A number of cases have reached our Court in which the navigability of a particular inland lake was at issue. By inland lake we mean any lake other than the Great Lakes, located completely within the State of Michigan.

In some cases navigability has been assumed, or has been touched upon as a side issue.

An attempt to deduce from the cases, the elements of navigability as that term is applied to inland lakes, is not wholly satisfactory.

It is clear that some inland lakes are navigable and some are not. Certain factors have seemed to bear on navigability as to inland lakes, and the factors are not precisely the same as in cases involving rivers and streams. We shall discuss these factors separately, in an effort to determine which of them are conclusive, which are essential, and which are merely probative.

The elements are: meander line; inlet and outlet; public access; boatability; prior commercial use; size.

First: meander line. A meander line is simply a surveyor's line. When used in connection with inland lakes, it refers to a line run by the government land office surveys, upon which titles to Michi-

gan real estate were originally patented to individual owners by the United States.

Original surveys contained meander lines around most of the larger inland lakes, especially where section lines would have been under the water. The meander line was largely a convenience for the surveyor; it did not represent a classification of the lakes. Some larger lakes were not meandered, especially where they did not touch upon the section lines. Some smaller lakes were meandered because section lines could not be run otherwise.

The meander line generally represented the shoreline. It was not necessarily exact. While some states have held that title to the lands within the meander line remained in the United States, and upon statehood vested in the state, Michigan does not regard a meander line as a boundary.[5] We have held that meander lines were merely a means of computing the acreage in the uplands—no charge being made by the government for subaqueous lands—and under our cases, the littoral owner has been held to take title to the land under the lake. The logic of the Michigan rule leaves something to be desired. If the patentee did not pay for the subaqueous lands, there is no reason to assume he took title to them.

If the meander line was merely a means of computing usable upland acreage, it would follow that the purchaser of government lands upon which a nonmeandered lake stood, was paying for unusable acreage.

It is possible that our forebears had some regard for this equitable distinction. An early statute declaring the right of public fishing—still on the books—refers to "navigable or meandered" waters. MCLA 307.41, 307.42; MSA 13.1681, 13.1682.

---

[5] *Hilt* v *Weber*, 252 Mich 198 (1930).

Whatever the weakness of our rule, it is too well settled at this point in time to question that littoral or riparian owners take title to subaqueous lands; the only distinction between meandered and non-meandered lakes being that in the former, the riparian owners take title to the center of the lake along pie-shaped extensions of their shoreline boundaries—while in the latter case, the riparian owner takes title only to the bottom land lying within the description conveyed to him.

While frequently mentioned in our reported cases as a descriptive fact,[6] the existence of a meander line has not been regarded as conclusive of navigability. In fact, it seems to have little bearing on the question.

Outlet and inlet, however, are very important, at least from the standpoint of an affirmative finding of navigability. If an inland lake has a navigable inlet or outlet, and if the lake itself is passable or boatable, it seems obvious that the lake forms a part of the aquatic highway and is navigable.

Some cases have discussed outlet and inlet in terms of the movement of fish, in an attempt to establish the public right of fishing in all waters directly or indirectly stocked with fish at public expense.

This factor seems to be of some evidentiary or probative value, but has never been the basis of a holding of navigability. Under the conservation laws, the state can stock private waters with fish without the consent of the owner. Fish planting is obviously a matter of policy and human choice. It can hardly be made the basis of determining rights in land.

---

[6] *Meridian Twp* v *Palmer*, 279 Mich 586 (1937); but see *Putnam* v *Kinney*, 248 Mich 410 (1929).

Mere out and inlet, therefore are not important *per se,* in determining navigability. Navigable inlet and outlet are important, however, because they provide a means of public access to an inland lake. Public access seems to have been regarded as significant in some of our past cases, as bearing upon the navigability of an inland lake;[7] although sometimes it has been held unimportant.[8]

It has been said that public access may be the test of lake navigability,[9] and it has been observed that a navigable inland lake without public access is simply a highway to nowhere—beginning and ending on private lands, having no public utility nor any capacity for valuable floatation, travel, transportation or commercial intercourse.

But the argument is less persuasive when analyzed. All highways connect private lands. Almost every journey upon the public highway begins and ends on private lands. The trucks and ships that carry our products; the cars and boats that carry our people begin and end their travels in private garages or at private docks. Indeed, it is the road that does not go to somebody's house or place of business that is truly a road to nowhere.

But it is said that a lake without public access cannot be used by the public, without trespass upon the uplands or fast lands of some riparian owner. The statement is not true. If it were true, it would be impossible for any person, not a riparian owner or a trespasser to be upon the waters of an inland lake having no public access.

---

[7] *Cass County Park Trustees* v *Wendt,* 361 Mich 247 (1960).

[8] *Winans* v *Willetts,* 197 Mich 512 (1917); *Pleasant Lake Hills Corp* v *Eppinger,* 235 Mich 174 (1926); *Putnam* v *Kinney,* 248 Mich 410 (1929).

[9] *Giddings* v *Rogalewski,* 192 Mich 319 (1916).

But we have often held that licensees of riparian owners may go upon such lakes, and use them as fully as their licensors. This applies equally when an agency of government is a riparian proprietor.[10]

Normally, we use the words "public access" to mean access from a public highway, publicly owned wharf or marina or access from a state, county or municipal park or boat or launch.

But public places and government lands are not synonymous. Indeed, the government may exclude the public from some of its lands; it may charge admission to others.

Conversely, most public places such as stores, restaurants and parking lots are privately owned real estate.

The right of every riparian owner to permit limitless numbers of licensees to go upon the whole lake, irrespective of the proportion of his shoreline ownership is undisputed.[11] By opening his doors and his shores to the public—with or without charge—he does not change the character of the lake.

If the lake is inherently a navigable body of water, he merely makes its use by the public more convenient, or possible without antecedent trespass, or license from some other littoral owner.

If the lake is not inherently a navigable body of water, he does not make it so by providing access to the public.

Private and public marinas may come and go, as profit or regulatory considerations dictate. Navigability as a legal concept cannot be made to depend upon such transitory things.

---

[10] *Gableman* v *Department of Conservation,* 309 Mich 416 (1944).
[11] *Manney* v *Prouse,* 248 Mich 655 (1929); *St. Helen Shooting Club* v *Mogle,* 234 Mich 60 (1926); *Beach* v *Hayner,* 207 Mich 93 (1919).

The public has no right to trespass upon privately owned uplands or fast lands.[12]

But in navigable waters, antecedent trespass as a means of access will not render the boater, or fisherman a continuing trespasser, once he has entered the water.[13]

Boatability, or floatability is obviously an essential factor in determining the navigability of an inland lake.

Swampland under 12 to 36 inches of water, and impassable in summer but by punting was held not navigable in *Baldwin* v *Erie Shooting Club,* 127 Mich 659 (1901).

A trial judge's expedition upon the waters of a disputed lake resulted in a finding of navigability where the lake was boatable by customary means. *Kerley* v *Wolfe,* 349 Mich 350 (1957).

Whatever other factors must be present, it is safe to conclude that an inland lake must be boatable to be navigable.

Prior commercial use is an elusive standard by which to measure navigability. As stated previously, that test was not crucial in the early Michigan cases.

In later cases, especially the "old logging stream" cases, the historical approach has reappeared.

In a recent United States Supreme Court decision involving the navigability of the Great Salt Lake, the historical or prior commercial use test was relied upon. *Utah* v *United States,* 403 US 9; 91 S Ct 1775; 29 L Ed 2d 279 (1971).

In that case, navigability was found, even though there was little evidence of valuable commercial navigation at the time of Utah's admission to the

---

[12] *Collins* v *Gerhardt,* 237 Mich 38 (1926); *Giddings* v *Rogalewski,* 192 Mich 319 (1916).
[13] *Douglas* v *Bergland,* 216 Mich 380 (1921).

Union, and the territorial navigation upon the lake seemed limited to a very few vessels. The Great Salt Lake is about 75 or 150 miles in size, scarcely more than 30 feet deep, and drying up.

One cannot read the *Utah* case, *supra,* without the feeling that the proofs were somewhat irrelevant, the real issue being whether the United States had or had not relinquished title to the bottom land of the lake.

The historical or commercial use has been suggested in some Michigan cases, notably *Meridian Twp* v *Palmer,* 279 Mich 586 (1937), in which some extant commercial use is mentioned in passing, and *Douglas* v *Bergland,* 216 Mich 380 (1921), in which established commercial use is mentioned in connection with a summary holding of navigability.

The prior commercial use test has very little to recommend it. It was specifically rejected in *Moore* v *Sanborne,* 2 Mich 520 (1853), and really provides no basis for deciding whether newly developed or undeveloped lakes are navigable or not.

This brings us to the factor which we believe most reliable in determining the navigability of inland lakes, and that is size.

While size has never before been specially declared to be the test of navigability, it is clear that size has been a highly probative factor. There are instances of repeated reference to the axiom that "small, privately owned lakes and ponds" are not navigable.[14]

We have heretofore adopted no fixed judicial definition of the difference between a lake and a pond, much less any established measure to test whether a lake is or is not a "small" lake.

---

[14] *Marsh* v *Colby,* 39 Mich 626 (1878); *Bushman* v *Estleman,* 256 Mich 243 (1931).

The morass of previous decisions, and the need for certainty in the future use and preservation of our inland lakes requires that we now adopt a fixed test for navigability of inland lakes, especially those which do not form part of larger chains or water-courses.

Navigability in the recreational context is no newly-discovered idea. MORSE, J., in his dissenting opinion in *Sterling* v *Jackson*, 69 Mich 488, 527 (1888), gives insight into the American tradition:

"The wild game and fish abounding in our woods and waters have never been the property of the general government or of the State, in the sense that they were held the property of the crown in England. No man here is granted special permission by the National or State government to kill game or catch fish exclusively at certain times or in certain places. Our game and fish laws are general, and apply to and govern the whole people. The fish of our waters, and the game of our woods, and the wild birds of the air, belong to the people, and not to the crown, and should always, when they can be captured or killed without detriment to private rights, be preserved to the people.

"Game and forestry laws are not in harmony with the American idea, and are of late origin in the history of our country. Such laws can only be supported and justified on the ground that the game is fast disappearing, and ought to and must be protected and preserved for the use and benefit of the people,—for the general public, and not for a specified few. Our fish and game laws have not been passed for the express benefit of clubs of wealthy sportsmen, who can afford to buy up or lease all the land along the navigable streams and lakes of this State, and thus shut out the poor man who loves the rod or gun as well as they do, and who, in the spirit of our institutions, has a common

right with them in the 'fowl of the air and the fish of the sea.'

"Large expenditures of money, drawn by taxation from all the people, rich and poor,—the poor man, as usual, paying at least his full proportionate share, if not more,—are being made annually to stock the public waters of this State with brook trout and other food fishes. The expenses of a gamewarden, and his deputies, lately added, in maintaining and enforcing the game laws, are borne by all, under the usual methods of taxation.

"The Pilgrim fathers, fleeing to the new world from the tyrannies of a despotic era in the history of the mother country, brought with them, not only religious ideas, but many other notions as to the rights of the common people not then prevalent or countenanced in England; and the old colony of Massachusetts Bay early adopted laws looking towards the establishment of a common right in the people to the fish and wild game then abounding in the waters and woods of the new world.

"In 1641 or 1647 it was enacted:

" 'Every inhabitant who is an householder shall have free fishing and fowling in any great ponds, bays, coves, and rivers, so far as the sea ebbs and flows, within the precincts of the town where they dwell, unless freemen of the same town, or the general court, have otherwise appropriated them: *Provided,* That no town shall appropriate to any particular person or persons any great pond containing more than ten acres of land, and that no man shall come upon another's propriety without their leave, otherwise than is hereafter expressed.' "

The Massachusetts Bay Ordinance of 1647 has formed an integral part of the development of water law in several of our sister states. 56 Am Jur, Waters, § 53, p 536.

We believe the classification of lakes between those of less and those of more than ten acres has

sufficient basis in history and reason to warrant application in Michigan.

That measure recognizes that 5,466 of Michigan's 7,661 inland lakes are of such size that, assuming they are natural bodies and conceding a boatable surface, they constitute the substance of the recreational and navigational heritage of all of the people of the state, to be preserved and maintained against pollution, destruction, impairment or expropriation for private gain to the exclusion of public right.

We hasten to add that navigability alone does not imply any right of free public access; that trespass upon adjoining uplands has never been and is not now permitted under Michigan law.

But a navigable inland lake, even though all of its shoreline and its bottom land be owned by a single private proprietor, is nonetheless impressed with an inchoate public trust, and it may no more be polluted or destroyed than the air above it.

Accordingly, we hold that Act 291 of 1965, the so-called Inland Lakes and Streams Act does apply to the waters of Wood Lake, and this cause is remanded to circuit court with instructions to enter an appropriate mandatory injunction for the removal of the unlawful partial filling thereof.

An important public question being involved, no costs shall be awarded.