**UNITED STATES of America**

v.

**GRANITE STATE PACKING COMPANY.**

Crim. A. No. 72–12.

United States District Court,
D. New Hampshire.

May 25, 1972.

Richard A. Morse, Sheehan, Phinney, Bass & Green, Manchester, N. H., for plaintiff.

William Cullimore, U. S. Atty., Concord, N. H., Allyn W. Hemenway, Jr., Atty., Environmental Protection Agency, Boston, Mass., for defendant.

## OPINION

BOWNES, District Judge.

The indictment in this case charges that the defendant on three occasions did unlawfully discharge and cause to be discharged into the Merrimack River at Manchester, New Hampshire, a navigable water of the United States, "refuse matter other than that flowing from streets and sewers and passing therefrom in a liquid state, to wit, blood, feces, grease, oil, paunch manure, stock pen manure, canning operations waste, rendering plant waste and other waste emanating from the manufacturing and slaughtering processes of said firm", in violation of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 407. Trial was to the court without a jury.

## THE EVIDENCE

The defendant conducts meat rendering operations at its plant located near the east bank of the Merrimack River on Hancock Street in Manchester, New Hampshire. Waste resulting from the operations is discharged into a stone culvert which empties directly into the River. The Public Works Director for the Manchester Highway Department testified that the culvert was probably constructed by the Concord Railroad Corporation before 1885, and that the Hancock Street sewer was connected to the culvert at a point between defendant's plant and the River as early as 1885. The Hancock Street sewer is a combined sanitary and storm system which services about 157 dwellings and 7 major commercial establishments. The Director did not know whether the City of Manchester has ever spent any money to maintain the culvert, and, as far as he knew, the City has no recorded property rights in the culvert. Nevertheless, the Hancock Street sewer has been tied into the culvert and used continuously since 1885, and the City would lose a valuable right if the culvert were sealed off from the sewer. The City's sewage is not treated in any manner, but is discharged directly into the Merrimack River. This practice, which is common to all of the cities bordering this once beautiful body of water, makes it one of the ten most polluted rivers in the country.

Donald Berger, a sanitary engineer for the Environmental Protection Agency (EPA), conducted a survey of defendant's plant and the waters adjacent thereto. In the course of his investigation, he talked to defendant's president and several employees, collected samples, measured flow rates, and observed defendant's plant. He testified that blood and paunch manure run into a trough in the plant which joins a twenty-four inch pipe which, in turn, empties into the stone culvert which discharges into the River. On November 22, 1971, November 23, 1971, and December 1, 1971, Berger collected water samples from two lo-

cations, where the twenty-four inch pipe joins the culvert (designated GS02) and where the culvert empties into the River (designated GS01). Ex. 3 and 4. At both locations Berger observed paunch manure and noticed a pungent odor. A grease slick was seen for about one-half mile on the River downstream from defendant's plant, congealed grease was seen on the riverbanks near the culvert, and the River was colored red in an arc of about thirty feet from the culvert's outlet. In addition, there was a buildup of solid material from defendant's plant in the River. Ex. 5. Several other witnesses testified that they had observed the same conditions.

Water samples collected by Berger were tested at the EPA laboratory in Boston for non-filterable residue (suspended solids), bacteria, oil and grease, and bio-chemical oxygen demand (BOD 5 test). The supervisory chemist, under whose direction the tests were performed, testified that Berger's samples indicated an extremely high BOD count which is indicative of oxygen consuming foreign substances, a high proportion of grease and oil to water, and a high proportion of suspended solids. An EPA micro-biologist conducted serology tests on one sample, the results of which indicated the presence of cow's blood.

Based on test results and flow data, it was estimated that 8,090 pounds of oxygen are consumed and 3,500 pounds of suspended solids and 10,000 pounds of oil and grease are deposited in the River from defendant's plant on an average operational day. Since the coloform bacteria count was lower than would be expected from domestic waste alone, test results indicated industrial waste discharge.

The Chief of Permits Branch, U. S. Army Corps of Engineers, Waltham, Massachusetts, Fred Moehle, testified that he is familiar with the history of the Merrimack River as a waterway and that locks were built about 1815 in the River between Lowell, Massachusetts, and Concord, New Hampshire. Thereafter, until the railroads assumed the primary burden of commerce, extensive freight was transported from Concord to Lowell and thence to Boston by means of shallow draft vessels. Several surveys were conducted by the Army Corps of Engineers on the Merrimack in the early 1900's. One survey examined the feasibility of extending a proposed eighteen foot channel from Hunts Falls at Lowell to Manchester by dredging. Excerpts from the survey, referred to the House Committee on Rivers and Harbors in 1917, indicate that the River was not then suitable for water-borne commerce and could only be made so at considerable expense. Ex. 11. In view of the costs involved, uncertainty of power development, and questionable freight saving benefits to existing industry on the River, the Committee must have concluded that improvements were not feasible.[1]

On October 7, 1971, Mr. Moehle inspected defendant's plant and met with representatives of the EPA, City of Manchester, State Water Pollution Control Commission, and defendant. Following his inspection, Moehle advised defendant's representative to apply for a discharge permit. Other industries along the Merrimack have applied for permits, but defendant has not yet applied. On cross-examination Moehle

---

1. This must be the survey referred to by Howard Fremont Hill in Merrimack: Sources, Navigation and Related Matters (n. p. n. d.) where the author states:

Old-timers will recall many endeavors, by Congressional action, to secure surveys of the river with a view to navigation. These efforts form part of what is roughly called the "pork barrel." It is connected with the rivers and harbors bill, a much-abused form of legislative appropriation, with which congressmen are wont to prop up their popularity. However much pleasure we may have at prospective expenditures in our neighborhood, it is plunder, pure and simple. As a matter of fact, at least one survey has been made as far as Lowell, long since. A later survey, 1914–15, has been made as far as Manchester, with the report, "Impracticable."

stated that the permit program is a "gray area" and that his understanding now is that application is not required of industries which discharge waste into municipal sewer systems.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Navigability within the meaning of the Acts of Congress has been given a broad construction by the courts. See Utah v. United States, 403 U.S. 9, 91 S. Ct. 1775, 29 L.Ed.2d 279 (1971); United States v. Appalachian Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940); Rochester Gas & Electric Corp. v. Federal Power Commission, 344 F.2d 594 (2nd Cir. 1965). The traditional and most frequently cited definition of navigability appears in the Daniel Ball, 77 U.S. 557, 10 Wall. 557, 19 L.Ed. 999 (1870), a case which involved an intrastate steamer engaged in passenger transport on the Grand River between Grand Haven and Grand Rapids, Michigan. The Court stated that:

> [T]hose rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. 77 U.S. 557, 563.

The Merrimack River is formed by the confluence of the Winnipesaukee and Pemigewasset Rivers at Franklin, New Hampshire; from there, it flows south through Concord, Manchester, and Nashua, New Hampshire, to Lowell, Massachusetts, where it turns east and, after flowing through Lawrence and Haverhill, enters the Atlantic at Newburyport.

Rock ledges, falls, and boulder ridden shallows, and the seasonal reduction of flow render it unsuitable for use as a waterway in its ordinary condition, and, even though it could be improved by dredging to support waterborne commerce between Manchester and Lowell, improvements are not feasible under present-day conditions.

■ Evidence adduced at the trial and historical facts, of which I take judicial notice, establish that the twenty-seven mile Middlesex Canal from Boston to Lowell was completed in 1803. In the same year, Samuel Blodgett completed his lock and canal around the Amoskeag Falls in Manchester. By 1816 other canals and locks had been completed downstream between Manchester and the Middlesex Canal, and for the next three decades, the Merrimack was the principal means of transportation between Boston and Concord for shipments of rum, grain, fish, granite, cordwood, and other bulky articles.[2] The coming of the railroads greatly diminished the importance of the Merrimack as a commercial highway in the 1840's, and, eventually, traffic ceased above Lowell. In its lower reaches, however, from Haverhill, Massachusetts, to its confluence with the sea at Newburyport, small steamers and schooners continued to trade, and that part of the River is still navigable in its ordinary condition. I find, therefore, that the Merrimack River between Manchester, New Hampshire, and Lowell, Massachusetts, as improved with locks and canals, was a navigable water of the United States in the early 1800's. And, in the eyes of the law, a river navigable in the past remains so in perpetuity as far as the authority of Congress is concerned,

2. Thoreau noted his observations of this traffic while on the Merrimack near Nashua in 1839:

> While engaged in these reflections, thinking ourselves the only navigators of these waters, suddenly a canal-boat, with its sails set, glided round a point before us, like some huge river beast,

and changed the scene in an instant; and then another and another glided into sight and we found ourselves in the current of commerce once more. Henry David Thoreau, *A Week on the Concord and Merrimack Rivers*, Houghton, Mifflin & Co. (1893 Ed.). At 187.

. . . since it is a natural interstate waterway, it is within the power of Congress to improve it at the public expense; and it is not difficult to believe that many other streams are in like condition and require only the exertion of federal control to make them again important avenues of commerce among the states. If they are to be abandoned, it is for Congress, not the courts, so to declare. The policy of Congress is clearly evidenced in the act of 1899, and, in the present case at least, nothing remains but to give effect to it. Economy Light Co. v. United States, 256 U.S. 113, 124, 41 S.Ct. 409, 413, 65 L.Ed. 847 (1921).

■ Since the Merrimack was navigable in fact in the early 1800's, it remains navigable for purposes of the Acts of Congress, even though it is not presently navigable, improvements in the foreseeable future are impracticable, and no evidence was produced to show navigability in its natural and ordinary condition between Manchester and Lowell before 1803. Economy Light Co. v. United States, *supra*; United States v. Appalachian Power Co., *supra*; Arizona v. California, 283 U.S. 423, 453, 51 S.Ct. 522, 75 L.Ed. 1154 (1931); Rochester Gas & Electric Co. v. Federal Power Commission, *supra*.

■■ I find further that the materials discharged by defendant are industrial wastes rather than "refuse matter . . . flowing from streets and sewers and passing therefrom in a liquid state." 33 U.S.C. § 407. The streets and sewers exception to the Act is narrowly construed to mean only domestic sewage. United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L. Ed.2d 903 (1960). All other discharges into navigable waters or their tributaries are prohibited, unless a permit has issued, regardless of whether actual obstruction to navigation results, United States v. Standard Oil Corp., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1965), and regardless of the effluent's effect upon the river. United States v. Pennsylvania Industrial Chemical Corp., 329 F.Supp. 1118 (W.D.Pa.1971).[3]

■■ One other matter remains to be considered, and that is whether defendant is exempted from the Act because its waste is discharged into a public sewer system. For purposes of this case, I find that the stone culvert is part of the municipal sanitary and storm sewer system of Manchester which empties directly into the River without any sewage treatment. Defendant's position, apparently, is that the Secretary of the Army, through the Chief of Engineers, can only permit discharges of waste directly into navigable waters. The Engineers Chief of Permits Branch for the New England Area advised defendant to apply for a permit, but he conceded at the trial that he did not think application was required for industries which discharge waste into municipal sewer systems. His understanding is only partially correct. The regulations issued pursuant to the Act except "[d]ischarges or deposits from a municipal or other public sewage *treatment* system;" [Emphasis added.] 33 C.F.R. § 209.131(d) (2) (i) (1971). Since defendant discharges into a public sewer which is not part of a treatment system, it is required to apply for a permit in accordance with the federal regulations. Even if a permit application were not required for defendant's discharge, assuming that a permit could not issue under the regulations, defendant would still be prohibited from discharging industrial waste into the stone culvert, since the prohibition part of the Act is broader than the exception for permits. The Act is not limited to prohibit only the types of discharges which require permit applications. Cf. Kalur v. Resor, 335 F.Supp. 1 (D.C.D.C.1971).

■ I find that the defendant has on three separate occasions, November 22, 1971, November 23, 1971, and December

3. EPA test results and estimates are material insofar as the coliform bacteria count indicated industrial waste emanating from defendant's plant.

1, 1971, unlawfully caused to be discharged into the Merrimack River at Manchester, New Hampshire, refuse matter consisting of blood, paunch manure, and grease; that such refuse matter is not refuse which flowed "from streets and sewers and pass[ed] therefrom in a liquid state"; that the Merrimack River at Manchester, New Hampshire, is a navigable water of the United States; and that no permit allowing such discharge had been issued by the Secretary of the Army to defendant.

The defendant is found guilty as charged. The clerk is directed to fix a date for sentencing.