MICHIGAN OIL COMPANY v NATURAL RESOURCES
COMMISSION

OPINION OF THE COURT

1. PUBLIC LANDS—STATE FORESTS—NATURAL RESOURCES COMMISSION
   —STATUTES.
   The Natural Resources Commission acts as the proprietor of land
   located in a state forest (MCLA 299.1 et seq.; MSA 13.1 et seq.).

2. MINES AND MINERALS—OIL AND GAS—CONTRACTS—PUBLIC LANDS
   —NATURAL RESOURCES COMMISSION—STATUTES.
   The Natural Resources Commission is authorized to enter con-
   tracts for the taking of oil and gas from state lands.

3. PUBLIC LANDS—NATURAL RESOURCES COMMISSION—RULES AND
   REGULATIONS—PROTECTION OF LAND—STATUTES.
   The Natural Resources Commission shall make rules for protec-
   tion of land and property under its control against wrongful
   use or occupancy as will insure the protection of state land and
   property from depredations and to preserve the land and
   property from molestation, spoilation, destruction or any other
   improper use or occupancy (MCLA 299.3a; MSA 13.4).

4. MINES AND MINERALS—OIL AND GAS—PUBLIC LANDS—DEPART-
   MENT OF NATURAL RESOURCES—RULES AND REGULATIONS—SU-
   PERVISOR OF WELLS—DRILLING PERMITS—STATUTES.
   The Department of Natural Resources is authorized to issue
   rules, regulations, requirements or orders concerning oil and
   gas operations on land under its control (MCLA 299.2, 319.23;
   MSA 13.2, 13.139[23]).

REFERENCES FOR POINTS IN HEADNOTES
[1, 3–17, 19–30, 34] 63 Am Jur 2d, Public Lands § 18.
  Constitutionality of reforestation or forest conservation legislation.
  13 ALR2d 1095.
[2, 4–17, 19–30, 34] 38 Am Jur 2d, Gas and Oil §§ 94, 145 et seq., 283.
  61 Am Jur 2d, Pollution Control § 79.
[18] 28 Am Jur 2d, Estoppel and Waiver § 26 et seq.
[31–34] 16 Am Jur 2d, Constitutional Law §§ 364, 365, 373.
[33, 34] 26 Am Jur 2d, Eminent Domain §§ 7, 8, 150, 153.

5. MINES AND MINERALS—OIL AND GAS—PUBLIC LANDS—SUPERVISOR
   OF WELLS—DRILLING PERMITS—DEPARTMENT OF NATURAL RE-
   SOURCES—STATUTES.

   The Supervisor of Wells is required by statute to deny an applica-
   tion for a drilling permit where the drilling would violate the
   DNR's rules and regulations concerning state lands (MCLA
   319.23; MSA 13.139[23]).

6. MINES AND MINERALS—OIL AND GAS—PUBLIC LANDS—NATURAL
   RESOURCES COMMISSION—WASTE—OIL CONSERVATION ACT—
   STATUTES.

   The Natural Resources Commission may prohibit the drilling for
   oil and gas on state lands under its control where the opera-
   tions would cause or threaten to cause waste, within the
   meaning of the oil conservation act, or where the operations
   would cause or threaten to cause molestation, spoilation or
   destruction of the state lands (MCLA 299.3a, 319.4; MSA 13.4,
   13.139[4]).

7. MINES AND MINERALS—OIL AND GAS—DRILLING PERMITS—PUBLIC
   LANDS—NATURAL RESOURCES COMMISSION—RULES AND REGULA-
   TIONS—STATUTES.

   Denial of a permit for drilling for oil and gas on state owned land
   was proper, even though the state had sold the oil and gas
   rights to the land at auction, where the denial served to
   prevent the destruction or spoilation of state land and was in
   furtherance of the Natural Resources Commission's powers to
   make and enforce reasonable rules and regulations concerning
   the use and occupancy of lands and property under its control
   (MCLA 299.2, 299.3a; MSA 13.2, 13.3).

8. MINES AND MINERALS—OIL AND GAS—DRILLING—WASTE—OIL
   CONSERVATION ACT.

   The act of drilling for oil may constitute or result in waste
   prohibited by the oil conservation act (MCLA 319.1 *et seq.;*
   MSA 13.139[1] *et seq.).*

9. MINES AND MINERALS—OIL AND GAS—DRILLING—WASTE—WILD-
   LIFE—NATURAL RESOURCES COMMISSION—FINDINGS OF FACT—
   STATUTES.

   Findings were sufficient to support the Natural Resources Com-
   mission's conclusion that drilling for oil at a proposed site
   would result in "waste", within the meaning of the oil conser-
   vation act, and "damage to or destruction of animals" where
   the findings indicate that the proposed drilling poses a serious
   threat to the survival of wildlife, *e.g.* elk, bear and bobcat,

found only in limited numbers in a limited area of the state (MCLA 299.1, *et seq.,* 319.1 *et seq.;* MSA 13.1 *et seq.,* 13.139[1] *et seq.).*

10. CONSTITUTIONAL LAW—TAKING OF PROPERTY—JUST COMPENSATION —OIL AND GAS—DRILLING PERMITS—DENIAL.

Denial of a permit for drilling for oil is not an unconstitutional taking of property without payment of just compensation where there is no claim or proof that denial of the permit results in loss of the primary value of the property in question.

11. MINES AND MINERALS—OIL AND GAS LEASE—PUBLIC LANDS—PO-LICE POWER—EXEMPTION.

A property interest in an oil and gas lease obtained from the state is not exempt from the proper exercise of the state's police power.

12. STATES—CONTRACTS—POLICE POWER—TAXING POWER.

The state as a sovereign may subject the interest acquired by a private citizen under a contract with the state to the taxing power and the police power, precisely as it might the interest acquired under any contract between two individuals.

13. MINES AND MINERALS—OIL AND GAS—DRILLING PERMITS—PUBLIC LANDS—NATURAL RESOURCES COMMISSION—FOREST MANAGE-MENT PLAN—RULES AND REGULATIONS.

Denial by the Natural Resources Commission of permits to drill for oil and gas in state forest land was proper, although the commission had not promulgated rules and regulations pursu-ant to the Administrative Procedures Act, where a forest management plan was being prepared for the property, the denial of permits was a reasonable means of protecting the commission's rule-making power, and permanent damage to the property could occur if drilling permits were not denied pend-ing promulgation of rules and regulations (MCLA 24.201 *et seq.;* MSA 3.560[101] *et seq.).*

14. ZONING—STATUTORY AUTHORITY—AGENCY REGULATIONS—LAND USE.

Agency regulations concerning the use of land are not necessarily zoning regulations for which statutory authority to zone is required.

15. ADMINISTRATIVE LAW—STANDARDS—REASONABLY PRECISE—DUE PROCESS.

Substantive due process requires only that a standard utilized by an administrative agency in the performance of a delegated

legislative task be as reasonably precise as the subject matter requires or permits.

16. CONSTITUTIONAL LAW—STATES—CONTRACTS—BREACH OF CONTRACTS—IMPAIRMENT OF CONTRACT.

Breach of contract by a government entity does not constitute an unconstitutional impairment of a contractual obligation (Const 1963, art 1, § 10).

17. MINES AND MINERALS—OIL AND GAS—PUBLIC LANDS—NATURAL RESOURCES COMMISSION—STATUTORY DUTY—WASTE.

The Natural Resources Commission, by leasing the oil and gas rights on state lands, did not and could not deprive itself of its statutory duty to prevent waste or destruction of the state's resources under its control.

18. EQUITY—ESTOPPEL.

An estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.

19. MINES AND MINERALS—OIL AND GAS—DRILLING PERMITS—NATURAL RESOURCES COMMISSION—EQUAL PROTECTION.

Denial of a drilling permit by the Natural Resources Commission did not deprive the holder of the oil and gas rights of the equal protection of the law, although drilling permits had been granted for other well sites in the area, where the denial was based on a plan having a rational foundation promoting a legitimate state purpose.

20. MINES AND MINERALS—OIL AND GAS—DRILLING PERMITS—NATURAL RESOURCES COMMISSION—RULES AND REGULATIONS.

The Natural Resources Commission may not indefinitely deny drilling permits on the basis of contemplated rules and regulations.

DISSENT BY W. R. PETERSON, J.

21. MINES AND MINERALS—OIL CONSERVATION ACT—SUPERVISOR OF WELLS—WASTE.

*The Supervisor of Wells, under the powers provided by the oil conservation act, may not determine that the very act of*

*drilling for oil and gas at a given location, regardless of how efficiently those operations are conducted, constitutes waste per se.*

22. MINES AND MINERALS—OIL AND GAS—DRILLING PERMITS—SUPERVISOR OF WELLS—DAMAGE TO ECOSYSTEM.

*The Supervisor of Wells may not deny permits for drilling for oil and gas whenever he determines that the drilling may damage the ecosystem.*

23. MINES AND MINERALS—OIL CONSERVATION ACT—WASTE—EFFICIENT PRODUCTION.

*The thrust of the oil conservation act is to conserve oil and gas, prevent its waste or loss, and promote its efficient production.*

24. MINES AND MINERALS—OIL CONSERVATION ACT—WASTE—INEFFICIENT OPERATING POLICIES.

*The definitions of waste in the oil conservation act deal with the literal waste of oil and gas from inefficient or imprudent operating policies.*

25. MINES AND MINERALS—OIL AND GAS—SUPERVISOR OF WELLS—REGULATION OF PRODUCTION.

*The powers given the Supervisor of Wells are for the regulation of oil and gas production and not for its prevention.*

26. MINES AND MINERALS—OIL CONSERVATION ACT—SUPERVISOR OF WELLS—ANTICIPATED WASTE—DRILLING PERMITS.

*The Supervisor of Wells is not authorized by sections of the oil conservation act dealing with waste to deny a drilling permit to prevent anticipated waste (MCLA 319.1 et seq.; MSA 13.139[1] et seq.).*

27. MINES AND MINERALS—OIL CONSERVATION ACT—ENVIRONMENTAL VALUES—MINERAL DEPOSITS—FRESH WATERS.

*The Legislature has not provided in the oil conservation act an absolute standard for the protection of certain environmental values as it has for the protection of fresh waters and mineral deposits (MCLA 319.1 et seq.; MSA 13.139[1] et seq.).*

28. MINES AND MINERALS—OIL CONSERVATION ACT—WASTE—UNNECESSARY DAMAGE—WILDLIFE.

*The definition of waste in the oil conservation act covers only the* unnecessary *damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil and gas operations (MCLA 319.2; MSA 13.139[2]).*

29. MINES AND MINERALS—OIL CONSERVATION ACT—UNNECESSARY DAMAGE—CARELESS OPERATIONS—SUPERVISOR OF WELLS—WASTE.

*The oil conservation act proscribes as unnecessary damage or destruction only that damage arising from careless or imprudent operations which might be prevented by appropriate precautions; the Supervisor of Wells is not given the power to define waste according to his relative assessment of the competing values of oil and gas production versus ecological considerations (MCLA 319.1 et seq.; MSA 13.139[1] et seq.).*

30. MINES AND MINERALS—OIL CONSERVATION ACT—SUPERVISOR OF WELLS—REGULATORY POWERS—OPERATING PRACTICES—AVOIDABLE DAMAGE.

*The oil conservation act confines the regulatory powers of the Supervisor of Wells to the establishment and enforcement of prudent operating practices and safety standards for the prevention of avoidable damage from ongoing operations (MCLA 319.1 et seq.; MSA 13.139[1] et seq.).*

31. STATUTES—CONSTRUCTION—VALIDITY—VESTED RIGHTS.

*A court cannot properly hold that the Legislature designed to commit such an act of injustice as to take away vested rights and destroy valuable existing interests; it is bound, if possible, so to construe statutes as to give them validity and a reasonable operation.*

32. CONSTITUTIONAL LAW—TAKING OF PROPERTY—ORDINANCES—REGULATIONS.

*An ordinance which permanently so restricts the use of property that it cannot be used for any reasonable purpose goes beyond regulation and must be recognized as a taking of property.*

33. CONSTITUTIONAL LAW—PUBLIC PURPOSE—TAKING OF PROPERTY—JUST COMPENSATION.

*No man's property may be taken from him for public purposes without payment of just compensation (Const 1963, art 10, § 2).*

34. MINES AND MINERALS—OIL AND GAS—SUPERVISOR OF WELLS—DRILLING PERMITS—DAMAGE TO ECOSYSTEM—CONSTITUTIONAL LAW—TAKING OF PROPERTY.

*Denial by the Supervisor of Wells of a permit to drill for oil and gas on certain property because of threatened damage to the ecosystem and threatened damage to animals is an unconstitutional taking of property where the permit denial is totally destructive of the value of the permit applicant's oil and gas lease.*

Appeal from Ingham, Thomas L. Brown, J. Submitted March 9, 1976, at Lansing. (Docket No. 24747.) Decided October 19, 1976. Leave to appeal applied for.

Michigan Oil Company appealed to the Natural Resources Commission from a decision of the Supervisor of Wells to deny a drilling permit on certain property in a state forest. The Pigeon River Country Association intervened. The commission affirmed the denial of a permit. Michigan Oil appealed to the circuit court, which also affirmed the denial of a permit. Michigan Oil appeals. Affirmed.

*Honigman, Miller, Schwartz & Cohn* (by *Jason L. Honigman* and *John Sklar) (Lynch, Gallagher & Lynch,* of counsel), for Michigan Oil Company.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Jerome Maslowski,* Assistant Attorney General, for the Natural Resources Commission and the Supervisor of Wells.

*Peter J. Vellenga,* for the Pigeon River Country Association.

Before: M. J. KELLY, P. J., and BRONSON and W. R. PETERSON,* JJ.

BRONSON, J. The area around the Pigeon and Black Rivers in northeastern Otsego County, in the northern part of Michigan's lower peninsula, is rich in a variety of natural resources.

Forests, rivers, and lakes are found here, particularly in the Pigeon River State Forest and the nearby Hardwood, Black Lake and Thunder Bay

---

* Circuit judge, sitting on the Court of Appeals by assignment.

State Forests. Since the area is largely state owned and largely undeveloped, it is relatively wild, unspoiled and secluded. Consequently, the area provides one of the few remaining favorable habitats for wildlife in Michigan's lower peninsula.

In this region is found Michigan's elk range, the home of the only sizeable wild elk herd east of the Mississippi River. The herd contains an estimated 500 to 1,000 elk, the descendents of a few hardy elk who were released in the area in 1918 in an effort to reintroduce the animal to Michigan after they had been driven from this state in the late nineteenth century.

The area provides a home for many other forms of wildlife in addition to elk. Evidence suggests that this area is the sole remaining stronghold for black bear in the lower peninsula, and between 30 and 50 bear are estimated to inhabit this region. The region also provides one of the few remaining favorable locations for bobcats in this state. Other more common species of wildlife also inhabit this region, including deer and various game birds.

Another natural resource which has been found in the region is *oil*. Exploitation of oil as a natural resource provides greater opportunity for profit than elk, bear, or bobcats. Whether that profitability can be exploited by the extraction of the oil consistent with the conservation of the wildlife resources of the region is one issue which has been litigated in this case. Another issue concerns the scope of the authority of the Department of Natural Resources (DNR) to regulate the utilization and conservation of all of the state's natural resources. Overshadowing the other questions presented is whether and how a major policy blunder by a public agency, here the DNR, may be corrected.

The term "blunder" is not too strong a word to

describe the DNR's 1968 decision to offer, at public auction, oil and gas leases covering some one-half million acres of state-owned land in the northern lower peninsula. The decision as to what lands to offer was made by the Natural Resources Commission with little investigation or consideration of the effects of possible drilling on state lands and other natural resources entrusted by law to the care of the commission.

The lack of scope and depth in the investigation is revealed by the testimony below which indicated that the various regional managers of the DNR were given nine days to make recommendations as to these some 500,000 acres. The only factor which was given consideration in arriving at the recommendations was whether any particular ongoing project, such as a state park, campground, or structural facility of some sort, was located on any particular parcel of land.

It appears from the record presented here that a major reason for leasing the land, and a likely reason for the limited consideration of the wisdom of that decision, was a feeling within the department that no one would actually do any drilling. It was only later, after several wells had been drilled and oil found in several locations, when further drilling was being planned by the oil and gas lessees, and after various individuals and groups of concerned citizens began to voice objections to the present and contemplated drilling, that the commission began to understand that there is really no such thing as a "free lunch".

Under attack here now by appellant Michigan Oil Company are the steps taken by the commission to limit the deleterious effects of its 1968 leasing decisions by giving consideration to plans for resource management to include the regulation of oil drilling on the state-leased lands.

We must now consider whether the steps taken were statutorily authorized and, if so, constitutionally permissible as those actions affect appellant. To examine these questions, some detail as to Michigan Oil's acquisition of its oil lease must be considered.

In the course of the oil and gas lease auction in August, 1968, bids totaling $1,122,788 were accepted for oil and gas leases covering 546,196.89 acres of state lands. The sales were approved by the commission and by the State Administrative Board in September of that year. Among those granted leases was Pan American Petroleum Corporation, which obtained leases covering 116,845 acres for a bid of $445,755. The leases obtained included State of Michigan Oil and Gas Lease No. 9656, which covered 1,760 acres of state land in Otsego County, Corwith Township, including 160 acres known as the southeast 1/4 of section 22 of township 32 north, range 1 west. This land was within the boundaries of the Pigeon River State Forest and contains the site of the drilling proposed by appellant, known as State-Corwith 1-22.

The lease was entered into pursuant to authority granted to the department by 1909 PA 280, as amended, and 1921 PA 17, as amended, and was stated to be for a period of 10 years, plus "as long thereafter as oil and/or gas are produced in paying quantities from said lands by the Lessee". The granting clause of the lease provided as follows:

" 'C' Said Lessor for and in consideration of a cash bonus in hand paid, the receipt whereof is hereby confessed and acknowledged, and the signing and delivery of a bond, the amount and sufficiency of which is to be determined by the Lessor, and of the covenants and agreements hereinafter contained on the part of the Lessee to be paid, kept, and performed, has granted,

demised, leased, and let, and by these presents does grant, demise, lease, and let, without warranty, express or implied, unto the said Lessee for the sole and only purpose of drilling, boring, mining and operating for oil and gas, and acquiring possession of and selling the same, and for laying pipelines and building tanks, power stations, and structures thereon, necessary to produce, save, and take care of such products, all those certain tracts of land situated in the County of Otsego, State of Michigan, and more particularly described as follows:

[description omitted]
it being the intention to convey to the Lessee the oil and gas rights to all of the lands described above subject to the control of the Department of Conservation as described herewith."

The lease included the following significant limitations:

" 'H' This lease shall be subject to the rules and regulations of the Department of Conservation now or hereafter in force relative to such leases, all of which rules and regulations are made a part and condition of this lease; provided, that no rules or regulations made after the approval of this lease shall operate to affect the term of lease, rate of royalty, rental, or acreage, unless agreed to by both parties."

Pan American Petroleum, by assignment dated December 14, 1968, assigned an undivided 50% of all of its rights in and to Oil and Gas Lease No. 9656 to Northern Michigan Exploration Company and Amoco Production Company. The assignment was approved by a deputy director of the Department of Conservation on March 18, 1969. Subsequently, on April 26, 1971, application was made by Northern Michigan Exploration Company and Amoco Production Company to the Supervisor of

Wells, a state officer, for a permit to drill a well on the southwest 1/4 of the southeast 1/4 of section 22. The application was turned down on the grounds that oil and gas drilling on that site would cause "serious and unnecessary damage" in that injury would be caused to various wildlife in the area, the swamp in the area would be affected, and the drilling would cause a "serious intrusion into a nearly solid block of semi-wilderness area of state lands". The denial specifically stated that *no* site in the 40 acres was acceptable.

Michigan Exploration Company assigned their interest in this 40 acres to McClure Oil Company on January 28, 1972. After departmental approval of this assignment, obtained on April 3, 1972, McClure entered into a "farm-out" agreement (as described in Judge PETERSON's dissenting opinion) with its wholly owned subsidiary, Michigan Oil Company, on May 19, 1972. Michigan Oil thereafter made application to the Supervisor of Wells on May 31, 1972 for a permit to drill a well on State-Corwith 1-22.

The application for a drilling permit was denied by the Supervisor of Wells by letter dated July 21, 1972. The letter, quoting from instructions by the Director of Natural Resources to the Supervisor of Wells, stated a number of reasons for the denial. It was said that oil and gas operations could not be conducted on the proposed site "without causing or threatening to cause serious damage to animal life and molesting or spoiling state-owned lands". Reference was made to the earlier denial of the previous application to drill on the same 40-acre tract and it was stated that conditions had not changed since that time. It was further stated that a forest management plan was being prepared, and that it would be appropriate to deny the

application and all other applications for drilling permits in the area under study pending completion of the plan.

Michigan Oil appealed the denial to the Natural Resources Commission pursuant to statutory provisions. After a hearing before an independent hearing examiner, the commission upheld the supervisor's denial of the drilling permit, stating in its order as follows:

"The action of the Supervisor of Wells in denying the drilling permit is upheld on the ground that to permit drilling will cause waste and constitute violation of * * * [1921 PA 17, as amended], and * * * [1939 PA 61, as amended]."

Among the commission's findings was that if a well were drilled in this area, "damage to or destruction of the surface, soils, animals, fish or aquatic life will occur". It concluded that if the well were permitted, waste, within the meaning of § 2 of 1939 PA 61, would occur.

Upon appeal to the circuit court, the commission's order upholding the Supervisor of Wells' denial of a drilling permit was upheld. Plaintiff now appeals the circuit court judgment as of right.

Appellant Michigan Oil asserts that by virtue of the rights which it has acquired in the oil and gas lease, the Supervisor of Wells and the Natural Resources Commission cannot deny it a permit to drill for oil, or at least not for the reasons given to support the denial. Appellant asserts that no statutory authority exists to justify the denial and that, even assuming the existence of such statutory authority, the exercise of such authority, under the circumstances of this case, would be unconstitutional. It is also asserted that the record

does not support the findings of fact upon which the commission's conclusions of law are premised.

Before discussing the legal issues raised, we think it appropriate to discuss more generally the sources of the authority of the Supervisor of Wells and the Natural Resources Commission with respect to the land in question. Since the land is owned by the state in fee, and located in a state forest, the commission acts as proprietor of the land pursuant to 1921 PA 17, as amended, MCLA 299.1 *et seq.;* MSA 13.1 *et seq.* One specific section of that act empowers the commission to enter contracts for the taking of oil and gas and to:

*"[M]ake and enforce reasonable rules and regulations concerning the use and occupancy of lands and property under its control".* MCLA 299.2; MSA 13.2.

Another section also invests the commission with rule-making powers as follows:

"The commission of conservation shall make such rules for protection of the lands and property under its control against wrongful use or occupancy as will insure the carrying out of the intent of this act to protect the same from depredations and to preserve such lands and property from molestation, spoilation, destruction or any other improper use of occupancy." MCLA 299.3a; MSA 13.4.

It would seem plain that the authority thus granted the commission by statute to enter into contracts for the taking of minerals necessarily implies authority to decide *whether* to lease and on what terms any lease will be entered into. This power to lease state lands is clearly meant to be exercised in light of all of the duties imposed upon the Natural Resources Commission including, among others, duties imposed by MCLA 299.3;

MSA 13.3, to "protect and conserve the natural resources of the state", to "provide and develop facilities for outdoor recreation", to "prevent the destruction of timber and other forest growth by fire or otherwise", and to "foster and encourage the protecting and propagation of game and fish". The commission clearly could have refused to lease the lands in question in order to further any of these goals. The question presented now concerns the authority of the commission with regard to state lands for which oil and gas leases have been sold, and more particularly the commission's role in the statutory procedure for the issuance of permits to drill for oil.

Section 23 of the oil conservation act, 1939 PA 61, as amended, MCLA 319.1 *et seq.;* MSA 13.139(1) *et seq.,* prohibits the drilling of oil or gas wells absent the issuance of a permit by the Supervisor of Wells. Strictly speaking, the statute makes it the duty of the Supervisor of Wells to grant or deny applications for permits to drill. However, the Department of Natural Resources is also accorded a role in such decisions. The relevant section of the statute appears to require that a drilling permit be issued upon the filing of a proper written application, the filing of a satisfactory surety bond, and payment of the required fee. The following proviso, however, indicates that the Department of Natural Resources is not without authority to take part in the permit issuing process:

"Provided, however, That no permit to drill a well shall be issued to any owner or his authorized representative who does not comply with the rules, regulations and requirements or orders made and promulgated by the supervisor: And provided further, That no permit shall be issued to any owner or his authorized

representative who has not complied with or is in violation of this act, or any of the rules, regulations, requirements or orders issued by the supervisor, or the department of conservation." MCLA 319.23; MSA 13.139(23).

This proviso would seem to involve the DNR, as well as the Supervisor of Wells, in the procedure for the issuance of drilling permits to the extent of the rule-making power of that agency. This section confers authority on the DNR to issue "rules, regulations, requirements or orders" concerning gas and oil operations on land under its control. Where such rules and regulations concerning state lands would be violated by the drilling for oil, the Supervisor of Wells would be required by statute to deny any such application for a permit.

The scope of the commission's authority to regulate oil and gas operations on land under its control is in part defined by other sections of the oil conservation act. Section 4 of that act provides that:

"It shall be unlawful for any person to commit waste in the exploration for or in the development, production, or handling or use of oil or gas; or in the handling of any product thereof." MCLA 319.4; MSA 13.139(4).

Since the commission has the power to "make and enforce reasonable rules and regulations concerning the use and occupancy of lands and property under its control", and may promulgate rules and regulations to protect such lands and property from "molestation, spoilation, destruction or *any other improper use* or occupancy", it would seem to follow that the commission may regulate oil and gas operations on state leased lands so as to prevent unlawful "waste". It follows that the commis-

sion may prohibit the drilling for oil on state lands under its control when such operations would cause or threaten to cause "waste" within the meaning of the oil conservation act or "molestation, spoilation, [or] destruction" of state lands.

In short, the commission, acting on behalf of the people of this state, has the authority and the duty to regulate state lands under its control and their authority to so act does not end when application for a permit to drill for oil on state lands is filed.

The present appeal may be discussed within the framework of the statutory scheme. We agree with the observation in the dissenting opinion of Judge PETERSON that the sequence of events which occurred here does indeed demonstrate an effort by the commission to redeem an apparent mistake. Quite clearly the commission has attempted to act so as to minimize possible deleterious effects of its ill-considered leasing decisions in 1968. But we see nothing wrong with a public agency, entrusted with preserving valuable resources belonging to the people of the State of Michigan, having once jeopardized those resources, taking all necessary and proper steps to rectify previous errors so as to benefit the public. To the contrary, we are of the opinion that any public agency, which is capable of recognizing that it has acted unwisely and which takes steps to rectify previous mistakes, should be encouraged so long as remedial efforts are lawful. Moreover, we think that the actions taken by the Supervisor of Wells and the Natural Resources Commission were within their statutory powers and not constitutionally prohibited.

Initially, we would disagree that the denial of the permit to drill was based solely on a claim of authority under the oil conservation act to prevent waste. As noted, the July 21 letter from the Super-

visor of Wells denying the permit relied not only on a claim of waste but also on the threat of "molesting or spoiling state owned lands" and additionally made reference to forest management plans then under consideration. While the language in the letter indicating that the proposed drilling would cause or threaten to cause serious damage to animal life implicitly relies on the section of the oil conservation act prohibiting waste, the language concerning the possibility of a "molesting or spoiling [of] state owned lands" clearly indicates reliance on the previously quoted sections of 1921 PA 17, as amended, giving the Natural Resources Commission authority to protect state lands under its control, as does the reference to the contemplated rules for the management of state owned lands.

The opinion of the Natural Resources Commission, upholding the supervisor's denial of the permit, similarly does not rely solely on the commission's powers to prevent waste under the oil conservation act. Rather, the opinion includes the following findings and conclusions clearly referring to the exercise of powers under 1921 PA 17, respecting state lands under the control of the commission:

"[T]he Commission must find that damage to or destruction of the surface, soils, animals, fish or aquatic life will occur."

Again,

"The Department is required to protect and conserve natural resources and game pursuant to Act 17, *supra. If the Department had not opposed the application for permit it would have failed in performance of this duty.*"

And, as has been noted, the commission's order specifically relies not only on the oil conservation act but also on 1921 PA 17.

The conclusion which we draw from this sequence of events is that the commission exercised not only their powers under the oil conservation act to regulate the drilling of oil and gas wells on state lands but also their more general powers as trustee of state land and resources including wildlife.

There is ample statutory justification for the reasons given for the denial of the permit. To the extent that the denial served to prevent the destruction or spoilation of state lands, it was justified by MCLA 299.3a; MSA 13.4, and to the extent that it was denied in the furtherance of the commission's powers to "make and enforce reasonable rules and regulations concerning the use and occupancy of lands and property under its control", it receives statutory justification under MCLA 299.2; MSA 13.2 and MCLA 299.3; MSA 13.3.

Moreover, we reject a construction of the oil conservation act which would only empower the Supervisor of Wells and the DNR to prohibit waste which is unnecessary to the production of oil and gas and thereby impliedly protects any and all other waste, no matter how serious, if necessarily incidental to the production of oil and gas. The definition of waste found in § 2 of the act is not so narrow. While the statutory definition does include "the unnecessary damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil and gas operations", the statutory definition includes as well the "ordinary meaning" of the term waste. We are not prepared to hold that the "ordinary meaning" of the term waste cannot include even the most serious perma-

nent damage to or destruction of any and all natural resources of the state incidental to the production of oil. Such a construction would be an unreasonable and unnecessarily narrow reading of the statutory language. We conclude that the construction given to the term waste by the Natural Resources Commission and the circuit court is the correct one and that the very acts of drilling for oil may constitute or result in waste prohibited by the oil conservation act. The Natural Resources Commission therefore possessed statutory authority to order the denial of a drilling permit in order to prevent waste.

Appellant asserts that the factual findings of the commission are not supported by "competent, material and substantial evidence on the whole record". Const 1963, art 6, § 28, Administrative Procedures Act, § 106; MCLA 24.306; MSA 3.560(206). Appellant would have us conclude that the evidence presented at the hearing below could not support a conclusion that oil drilling operations on the proposed site would result in serious harm to wildlife inhabiting the surrounding area. This position is untenable. The uncontradicted evidence below established that the proposed drill site is located in the midst of Michigan's elk range, that the elk herd which inhabits this area is the last sizeable wild elk herd east of the Mississippi River, and that oil and gas operations would cause the elk to avoid the area surrounding such operations, resulting in the reduction in the range and habitat of the elk and the decline in the population of the herd. Uncontradicted evidence established that oil and gas production activities would have the same effect on bear and bobcat, and that the area presently provides one of the few remaining favorable locations for bear and bobcat in lower Michigan.

These factual findings are amply supported by the record and indicate that the proposed drilling poses a serious threat to the survival of wildlife already found only in limited numbers in a limited area of the state.

These findings are sufficient to support the commission's legal conclusion that drilling on the proposed site would result in "waste" within the meaning of the oil conservation act and "damage to or destruction of" animals within the meaning of 1921 PA 17.

We turn next to the alleged constitutional infirmities in the commission's actions. Appellant claims that the denial of a permit to drill for oil constituted an unconstitutional taking of property without payment of just compensation. We disagree. As correctly pointed out by the circuit court judge in discussing this issue, there is no claim here and no proof that denial of this drilling permit would result in the loss of the primary value of the property in question. It is clear, however, that should appellant never receive a drilling permit, whatever property interest appellant claims in the property in question would be valueless.

It would appear to be clear and undisputed that the fact that appellant's property interest was in the first instance derived from a contract with the state does not and could not thereby exempt that property interest from the proper exercise of the state's police power. See *Robertson v Commissioner of State Land Office*, 44 Mich 274, 278 (1880), *Tucker v Gvoic*, 344 Mich 319; 74 NW2d 29 (1955), *Texas & New Orleans R Co v Miller*, 221 US 408, 414; 31 S Ct 534; 55 L Ed 789 (1911), *American Land Co v City of Keene*, 41 F2d 484 (CA 1, 1930).

The Michigan Supreme Court, in *Robertson, supra,* at 278, had the following to say with respect to the state's power to regulate interests acquired pursuant to contracts between the state and a private citizen:

"The State as a sovereign cannot deal with it otherwise than as it might with a contract between two private citizens. But the State as a sovereign may subject the interest acquired by the contract to the taxing power and the police power, precisely as it might the interest acquired under any contract between two individuals, and not otherwise."

Also undisputed, and of significance in determining whether some property right obtained by appellant pursuant to the oil and gas lease in question has been "taken", is the fact that the lease was expressly made subject to "rules and regulations of the Department of Conservation now or hereafter in force". The sole restriction which the lease purported to make on the commission's control of the property was that rules and regulations made after the approval of the lease could not affect the "term of lease, rate of royalty, rental, or acreage", none of which restrictions are relevant to the instant case. It is thus inherent in the very nature of the property interest acquired by appellant by virtue of the 1968 oil and gas lease that the property interest at all times was to remain subject to the Natural Resources Commission's authority to regulate state lands under its control.

Clearly the lease does not guarantee that the lessee will be permitted to drill for oil. The commission expressly retained its statutory authority to fulfill its duty to the people of the State of Michigan by regulating the use of the state lands and resources placed in its control and held by it

as a public trust. Since the commission thus retained its authority to prevent the "molestation, spoilation, [or] destruction" of the property in question, as well as to prevent "waste" in the production of oil and gas on that property, a proper exercise of that authority could not result in any diminishing of appellant's interest in the property obtained pursuant to the oil and gas lease. Since appellant's property interest is partially defined by the commission's statutory authority to regulate state lands, a proper exercise of that authority could not result in a taking in the constitutional sense.

Nor is this conclusion affected by the fact that the commission had not promulgated rules and regulations pursuant to the Administrative Procedures Act at the time of the denial of a drilling permit to appellant. The denials clearly indicated that a forest management plan was being prepared. Denial of oil drilling permits for areas which would be covered by such a plan pending completion of the plan was a reasonable, if not essential, means of protecting the commission's rule-making power. If drilling permits could not be denied pending promulgation of rules and regulations under consideration, permanent damage could occur in the interim rendering futile the commission's efforts to develop and promulgate official rules and regulations dealing with the area in question.

Appellant next asserts that the denial of the drilling permit pursuant to a resource management plan constituted a zoning plan and was illegal because the Natural Resources Commission possesses no statutory authority to engage in zoning. In conjunction with this argument, appellant also argues that to the extent that the commission

has engaged in zoning and has denied their application for a drilling permit pursuant to a plan of zoning, that the denial is illegal because not subject to any standards.

The argument that the commission is without zoning power may be easily disposed of. This argument amounts to little more than a play on words. Every agency regulation concerning the use of land is not necessarily a "zoning" for which specific statutory authority to zone is required. The commission has the statutory authority, as discussed previously, to regulate the use of state lands, to prevent destruction of state lands and resources, and to control waste. They did not need statutory authority to "zone".

Nor do we agree with appellant that the decisions of the Supervisor of Wells and the commission were unlawful because not guided by statutory standards. The statutory standards which were relied upon, the threat of "waste" and "molestation, spoilation, or destruction" of state lands, provide an adequate statutory standard.

Substantive due process requires only that a standard utilized by an administrative agency in the performance of delegated legislative tasks be "as reasonably precise as the subject matter requires or permits". *State Highway Commission v VanderKloot,* 392 Mich 159, 173; 220 NW2d 416 (1974), *Osius v St Clair Shores,* 344 Mich 693, 698; 75 NW2d 25 (1956). In such a case, administrative officials are not left with the unbridled authority to act arbitrarily.

The Supreme Court recently held that the standard of "necessity" in the context of the highway condemnation act was a sufficient standard to meet due process requirements. *State Highway Commission v VanderKloot, supra.* We think that

the Natural Resources Commission and the Supervisor of Wells here acted pursuant to standards at least as precise as the standard upheld in *Vander-Kloot.* Even more detailed standards may be expected to be defined upon promulgation by the commission of its contemplated plan for forest management. We hold that the actions were taken pursuant to a standard sufficient to meet due process requirements.

Appellant further asserts that the denial of a drilling permit constituted an unconstitutional impairment of a contract obligation by the state and is for that reason void. It is also argued that the state should be equitably estopped from depriving the appellant of its drilling rights by refusing the drilling permit.

Article 1, § 10 of the Michigan Constitution provides that: "No * * * law impairing the obligation of contract shall be enacted." The best that can be said for appellant's argument is that it confuses the constitutional prohibition against the state enacting laws impairing the obligations of contracts with the state allegedly breaching a contract to which it is a party. It has long been recognized that mere breach of contract by a governmental entity does not constitute an unconstitutional impairment of a contractual obligation. *Thompson v Auditor General,* 261 Mich 624, 634; 247 NW 360 (1933), *St Paul Gaslight Co v St Paul,* 181 US 142; 21 S Ct 575; 45 L Ed 788 (1901), *Shawnee Sewerage & Drainage Co v Stearns,* 220 US 462; 31 S Ct 452; 55 L Ed 544 (1911).

Furthermore, as noted previously, this lease did not necessarily contemplate that the Supervisor of Wells and the Natural Resources Commission would be required, under any and all circumstances, to issue a drilling permit to the lessee.

The commission, by entering into this lease, did not and could not deprive itself of its statutory duty to prevent waste or destruction of the state's resources under its control. In fact, this lease was expressly made subject to rules and regulations of the commission "now or hereafter in force".

Michigan Oil Company's argument that the state should be equitably estopped from denying a permit to drill is without merit. Appellant's theory is that when the state, through one of its agencies, sold the lease in question to Pan American Oil Corporation, they impliedly promised that a permit to drill would be issued. The doctrine of equitable estoppel was defined by the Michigan Supreme Court in *Holt v Stofflet,* 338 Mich 115, 119; 61 NW2d 28 (1953), where it was said:

" 'It is a familiar rule of law that an estoppel arises when one by his acts, representations, or admissions, or by his silence when he *ought to speak out,* intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts.' "

The circuit court held that, on the facts of this case, there was no holding out of erroneous facts to Michigan Oil nor justifiable reliance on their part. This holding was correct as the record supports the following finding of the circuit court judge which is unchallenged on this appeal:

"Indeed, Mr. Orr, President of Michigan Oil, testified that he learned of the State-Corwith in question through his capacity as a member of the Oil and Gas Advisory Board of the Supervisor of Wells, and he further testified that he knew of the prior refusal of a permit when Michigan Oil purchased the lease and

indeed it was purchased *because* a permit had previously been denied! In other words, Michigan Oil took a chance and lost." (Emphasis in the trial court opinion, transcript citations omitted.)

Appellant's final argument is that the instant denial of a drilling permit deprived appellant of its constitutional right to equal protection of the law in view of permits which had been and have been granted to others in areas from within 2-1/2 to 7-1/2 miles from appellant's proposed well site. Appellant places particular reliance on the oil drilling permit granted for the well designated as the Charlton 1-4 discovery well, which is approximately 2-1/2 miles southwest of State-Corwith 1-22. Appellant has not, however, made out a case of arbitrary action denying it equal protection.

The Charlton 1-4 well was completed in June of 1970. It is clear that the standards for issuing drilling permits were substantially changed after the permit for this well was issued and there was testimony at the hearing below which indicated that under the standards in effect at the time of appellant's application, the Charlton 1-4 permit would also have been denied. Stricter standards for the prevention of waste and destruction of natural resources other than oil were implemented after the Charlton 1-4 well had been drilled and in fact largely because the drilling of that well had increased awareness within the department of the detrimental effects of a successful oil well on the Pigeon River State Forest.

The constitutional guarantee of equal protection of the laws certainly does not mean that a state agency, upon discovering that a former policy was in error, must nevertheless continue to pursue that dangerous policy to the point of destruction.

Moreover, as the threatened damage to animals

in the Pigeon River area is in large part based on
the fact that the animals will tend to avoid human
activity, the commission, having once permitted a
company to drill for oil in the Pigeon River area,
was faced with choosing between a policy of per-
mitting oil drilling on all state leased lands, leav-
ing no undisturbed area into which the animals
could move, or drawing a line beyond which drill-
ing would not be permitted. Thus, while drilling
permits have been granted in the immediate area
surrounding Charlton 1-4 and in the immediate
areas of other wells already drilled, drilling in
those areas would not cause additional encroach-
ments into previously undisturbed areas or neces-
sarily cause any further disruption of wildlife
living habits in those areas. On the other hand, no
permits have been issued for any of the land in
the 25-square-mile area surrounding proposed Cor-
with 1-22, indicating that denial of the instant
permit was based on a plan having a rational
foundation promoting a legitimate state purpose
and therefore constituting no denial of equal pro-
tection to appellant.

We conclude that the circuit court judgment
should be affirmed. The denial of a drilling permit
to appellant Michigan Oil Company was contem-
plated by their lease. It constituted a statutorily
permissible exercise of the authority of the Natu-
ral Resources Commission. It deprived appellant of
no constitutional right.

We caution the Natural Resources Commission
that appellant cannot be denied indefinitely a
drilling permit on the basis of contemplated rules
and regulations. We expect that a comprehensive
management plan be completed and officially pro-
mulgated in the near future. While we approve of
administrative agencies demonstrating a degree of

flexibility in perceiving and reacting to new problems or dealing with past mistakes, the procedural safeguards contained in the Administrative Procedures Act, MCLA 24.201 *et seq.;* MSA 3.560(101) *et seq.,* must also be recognized as the public's first defense against arbitrary agency action. Should Michigan Oil Company apply once more for a drilling permit, the Natural Resources Commission will have to show some substantial progress towards official promulgation of the rules and regulations which they have been considering in order to justify further denials. On the present record, however, we see sufficient evidence that the commission has undertaken to shoulder previously neglected responsibilities to justify the disputed denial.

Affirmed. No costs, this being a public question.

M. J. KELLY, P. J., CONCURRED.

W. R. PETERSON, J. *(dissenting).* This is an appeal from a judgment of the Circuit Court of Ingham County upholding the denial by the Michigan Department of Natural Resource (DNR) of a permit to drill for oil and gas on property which had been leased by the DNR for the express purpose of drilling for gas and oil. An apparent denial was initially made by the Supervisor of Wells, the issuing officer, and denial was upheld on appeal by the Natural Resources Commission. The denial is founded solely upon a claim of a police power under the oil conservation act[1] to prevent "waste", here found by the commission to consist of threat-

---

[1] 1939 PA 61, as amended; MCLA 319.1 *et seq.;* MSA 13.139(1) *et seq.* References to the act hereafter will be by section number only, identifiable in MCLA by the number after the decimal and in MSA by the number in parentheses. Thus § 23 of the act is cited as MCLA 319.23 and MSA 13.139(23).

ened "damage to the ecosystem and serious or unnecessary damage to animals".[2]

We are presented with the question of whether such damage constitutes "waste" under the oil conservation act and, if so, whether that justifies denial of the drilling permit. We are not concerned with the Environmental Protection Act; the appellant's environmental impact statement complied with the act and was approved by the DNR staff. Neither are we concerned with the qualifications of appellant; no claim was made that appellant was other than a careful, prudent operator of long experience in the business, or that appellant was or had been in violation of the oil conservation act or the rules and regulations promulgated thereunder.[3]

The sequence of events demonstrates an effort to redeem an apparent public agency mistake without confession of error, at private expense, and, of course, in the name of the public good.

By lease dated October 1, 1968, the DNR conveyed the oil and gas rights to certain lands in the Pigeon River State Forest. As to one such lease, appellant is the successor to forty acres in section

---

[2] While my brothers find the action of the commission to be properly founded in the duty imposed upon the commission by 1921 PA 17; MCLA 229.1 *et seq.;* MSA 13.1 *et seq.,* to manage public lands under its control, the commission itself made factual findings only of "damage to or destruction of the surface, soils, animals, fish or aquatic life", language contained in the oil conservation act's definition of waste. And see the commission policy statement of June 11, 1971, fn 8, *infra.* While my brothers cite § 2 of 1921 PA 17 empowering the commission to adopt rules and regulations to implement the act, neither they nor the commission have asserted any such rule or regulation as the authority for the commission's action herein. Since there is none such, the omission is eminently reasonable.

[3] The rules and regulations promulgated under the act as part of the State Administrative Code are set forth at R 299.1101, *et seq.* There are none dealing with waste in the environmental or ecological sense, or restricting the issuance of drilling permits in relation to environmental or ecological factors.

22 of Corwith Township in Otsego County, referred to as State-Corwith 1-22.[4] Prior to the 1968 sale of oil and gas leases by the DNR, the lands to be offered were reviewed by the various divisions of the DNR, including the Game Division, the Forestry Division, the Parks Division, and various divisions dealing with research and planning, to determine whether any of the lands described should either be withheld or offered for lease subject to special restrictions for the protection of special conservation interests and values. No withholding or restriction was recommended in the Pigeon River State Forest.[5]

After a number of wells had been drilled in the forest, this viewpoint within the DNR was reversed. One need not be a mystic to divine from this record that the change of position did not result from expert research or evaluation in the

---

[4] The lease provides:

" 'C' Said Lessor * * * has granted, demised, leased and let, and by these presents does grant, demise, lease, and let, without warranty, express or implied, unto the said Lessee for the sole and only purpose of drilling, boring, mining and operating for oil and gas * * * and for laying pipelines and building tanks, power stations, and structures thereon, necessary to produce, save, and take care of such products, all those certain tracts of land, * * * (descriptions omitted) * * * it being the intention to convey to the Lessee the oil and gas rights to all of the lands described above subject to the control of the * * * (Lessor) as described herewith.

* * *

" 'G' The Lessor reserves * * * the right to use or lease said premises, or any part thereof, at any time, for any purpose other than, but not to the detriment of the rights and privileges herein specifically granted; * * * ".

As noted in the majority opinion, the lease also provided that it was subject to the rules and regulations of the DNR "now or hereafter in force" relative to such leases; but as noted, fn 3, *supra,* there are *no* rules and regulations bearing on the issues of this case!

[5] The majority's view that the departmental review was inadequate may or may not be true. This is neither an issue here, nor was it before the commission. It is, however, to this stage of departmental procedure that reform should be directed rather than to legalistics over empty barn locks. *See* Christopher D. Stone, *Should Trees Have Standing,* Avon Books, New York, 1972.

operating levels of the DNR but was a determination to which the commission itself had been led by concerned public opinion. Without admitting that leasing in the forest had been error, claiming credit for itself for "an increased awareness of quality environment", and crediting public interest as "a recent development which makes it reasonable to deny" drilling permits,[6] the DNR attempted to retrieve with its left hand that which it had sold with the right. The justification for denial of drilling permits was premised, notwithstanding an opinion of the Attorney General to the contrary,[7] on an interpretation of the oil conservation act by which the very acts of drilling for and producing oil and gas in a particular locale could be deemed "waste" as injurious to the environment.[8]

On May 31, 1972, appellant made its application to the Supervisor of Wells for a drilling permit pursuant to § 23 of the oil conservation act. Although the application was in proper form, the supervisor failed to act on the application within five days as required by that section.[9] He ulti-

---

[6] Exhibit A-73, letter of the DNR director to Supervisor of Wells, July 20, 1972, ordering the supervisor to deny appellant's application for a drilling permit.

[7] Counsel consulted too late are prone to advise in hindsight that the client should have had foresight. OAG, 1971–1972, No 4718, p 17 (April 6, 1971), concluded that control over environmental problems from oil and gas operations on state land lay in not leasing in the first place, the kind of lawyerism which drives most clients to ignore the answer they didn't want in the second place. So, too, the DNR.

[8] On June 11, 1971, the commission adopted a policy statement, including the following:

"2 * * *

"b. Each oil and gas drilling permit application shall be judged on its own merits. When it is determined by the Department that the drilling at the location specified in the application will cause serious or unnecessary destruction of the surface, soils, animal, fish or aquatic life or unreasonably molest, spoil, or destroy state-owned lands, the permit may be denied by the supervisor of wells. Such findings shall be fully justified in writing."

[9] 1973 PA 61 amended § 23 to extend to 10 days the period within

mately responded on July 21, 1972, saying that he
had been ordered to deny the application by the
director of the DNR,[10] who had said,

"Oil and gas operations at the above site cannot be
conducted without causing or threatening to cause seri-
ous damage to animal life and molesting or spoiling
state-owned lands."[11]

Treating the letter as a denial of its application,
appellant took its appeal to the commission, whose
new policy militated against drilling in the forest
and whose director had ordered the Supervisor of
Wells to deny the permit. The commission ap-

which action on applications must be taken and § 3 to provide that
thereafter the director of the DNR rather than the state geologist
would be the Supervisor of Wells.

[10] The letter (exhibit A-74) of the supervisor, a DNR appointee, is a
marvelous specimen of governmentalese by which he neither took
personal action on the application nor expressed any reasoning or
responsibility therefor. Rather, it commenced:

"I have been instructed by the Director of Natural Resources to
deny your application for a permit", etc.,

then quoting in its entirety the director's letter so commanding him.

This procedure suggests several questions which have not been raised.
Does the Supervisor of Wells exercise a ministerial or discretionary
duty in acting on drilling permit applications? Clearly, if the DNR
interpretation of the licensing procedure is accepted, the role of the
supervisor is discretionary in the quasi-judicial sense, but just as
clearly, he abdicated his discretionary power, merely relaying to the
applicant the order given him by one who had no statutory role in the
permit procedure.

Moreover, other provisions of the act were ignored, including the § 6
provision that the supervisor exercise his powers for the prevention of
waste after consultation with the Oil and Gas Advisory Board, and
the § 7 provision requiring hearing by the board "to determine
whether or not waste is taking place or is reasonably imminent, and
what action should be taken to prevent such waste".

It evinces a departmental predisposition to deny the application in
spite of the act and not because of it, and might lead the uninitiated
to suspect that appeal to the commission would be fruitless.

[11] From the letter of the director, *supra* fn 6.

The record discloses no basis for the director's conclusion that state-
owned lands would be molested or spoiled within the meaning of 1921
PA 17, and the DNR does not now so contend.

pointed an independent hearing examiner who took extensive testimony, personally visited the site on two occasions, and made detailed findings and conclusions of law sustaining appellant's position and recommending issuance of the drilling permit. His findings and report were rejected by the commission which directed the Attorney General to submit findings and conclusions to the contrary. Those proposed findings, derived in relevant part from the testimony of six DNR staff employees, were adopted by the commission, which affirmed the denial of the permit.[12]

Appeal on the record was taken to the Circuit Court of Ingham County which upheld the commission's denial of the permit, and this appeal of right followed.

Is the commission's finding of "[d]amage to the ecosystem and serious or unnecessary damage to animals" supported by the record? Not in those terms. The record does not show the damage to

---

[12] The pertinent portion of the commission's findings, reads as follows, transcript citations omitted:

"Damage to the ecosystem and serious or unnecessary damage to animals would be caused by opening entrance roads, truck traffic, succession of wells and general activities encountered in an oil-gas production. Particularly, serious effects would be caused to elk, bear and bobcat and would cause their virtual removal from a portion of the Pigeon River area. The tendency of the animals would be to avoid the area. Such effect would be particularly noticeable in the case of elk who are a wide ranging animal.

\* \* \*

"The Pigeon River area is the last stronghold of the bear and bobcat. Places where bear and bobcat can live are limited. Section 22 is good bear habitat \* \* \* .

"Elk would be particularly affected by an oil operation because of their fragile nervous system and even clearing one acre will affect them. In turn, many small animals would be affected \* \* \* .

"The above testimony from game biologists as to the effect of the drilling of a well in this area comes from the DNR presentation and the opinions of their experts are unrebutted on the record. On considering this foregoing testimony the Commission must find that damage to or destruction of the surface, soils, animals, fish or aquatic life will occur."

animals to be unnecessary within the meaning of
the act, and ecosystem damage as such is irrele-
vant under the act, of which more hereafter. I do
not share the conclusion of the circuit judge that
the testimony before the hearing examiner "over-
whelmingly" supported the commission's findings
rather than those of the examiner. I find it, rather,
a close question as to whether there is serious
damage to animals, particularly if one may allow
that the credibility of the opinions of the DNR
employees upon which the findings turned was
open to question. The hearing examiner obviously
found those witnesses to be something less than
infallible, and their opinions without credible foun-
dation and inconsistent with the experience of
other human activities in the area (fn 13, *infra);*
the commission's findings, on the other hand, gave
full faith and credit to their opinions and exper-
tise, without which latter they doubtless would not
have obtained nor kept departmental employment.
Q.E.D.

There is no dispute that the location of the
proposed well is in the Pigeon River State Forest,
that the forest is the site of the only elk popula-
tion in the lower peninsula of Michigan, and that
it also provides good habitat for bear and bobcat. I
find the commission's findings of serious damage to
animals supported by the record to the extent that
there was substantial testimony from six DNR
employees that: (a) the forest may be the last area
of size supporting bear and bobcat in the lower
peninsula; (b) bear, bobcat and, particularly, elk,
while they would not be directly injured by drill-
ing or oil-gas production, would tend to avoid areas
of such activity;[13] and, (c) in consequence, the

---

[13] The testimony of the DNR game biologists indicated that these
animals would tend to avoid man, man-made objects and human
activities, of which there are already considerable in the Pigeon River

range and habitat of these animals would likely be reduced and their population would likely decline.

It is the contention of the commission that the Supervisor of Wells, under the police powers provided by the oil conservation act, may make a determination that the very act of drilling for oil and gas at a given location, and of there operating a producing well, however efficiently those operations may be conducted, may constitute waste per se, and that he may accordingly deny the right to so drill and operate. From the statutory duty imposed on the supervisor to prevent waste and a statutory definition of waste that includes "unnecessary damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil and gas operations", the commission contends that the right to drill for and produce gas and oil may be denied wherever and whenever the supervisor determines that damage may be done to the ecosystem. I do not so read the act.

Apart from the *pro tempore* concern of 1939 with overproduction in a depression market as waste,[14] the thrust of the oil conservation act is to conserve oil and gas, preventing its waste or loss and promoting its efficient production. Thus, § 1, stating the policy of the act, concludes:

"It is accordingly the declared policy of the state to

State Forest (in large measure conducted, sponsored or licensed by the DNR), *e.g.*, fishing, hunting, logging, motorcycling, snowmobiling, and oil and gas wells. I note that the DNR experts in response to questions about the other human use of the forest, contended that it has not permanently damaged the forest or its wildlife, that it is reversible and that an excess of such permitted use in the past does not justify a greater use in the future but rather a reduction of such other use. Let us hope. So far as the granting of other drilling permits in the forest, prior to or after the proceedings before the hearing examiner in this case, I accept the DNR position that it has been on a selective site-by-site evaluation, attempting to minimize the impact on the forest of its previous ill-considered leasing.

[14] *See* §§ 2(l)(2)(3), 2(l)(3), 2(m)–(r), 12, 13.

protect the interests of its citizens and land owners from unwarranted waste of gas and oil and foster the development of the industry along the most favorable conditions and with a view to the ultimate recovery of the maximum production of these natural products. To that end this act is to be construed liberally in order that effect may be given to sound policies of conservation and the prevention of waste and exploitation." MCLA 319.1; MSA 13.139(1).

The primary definitions of "waste", subsurface and surface, deal with the literal waste or loss of oil and gas from inefficient or imprudent operating policies, and all of the specific powers given the Supervisor of Wells to prevent waste relate to the prevention of such operating practices or the requirement of sound practices. The conferred powers of the supervisor are for the regulation of production and not for its prevention.

The definition of waste is as follows:

"(l) As used in this act, the term 'waste' in addition to its ordinary meaning shall include:

"(1) 'Underground waste' as those words are generally understood in the oil business, and in any event to embrace (1) the inefficient, excessive, or improper use or dissipation of the reservoir energy, including gas energy and water drive, of any pool, and the locating, spacing, drilling, equipping, operating, or producing of any well or wells in a manner to reduce or tend to reduce the total quantity of oil or casing-head gas ultimately recoverable from any pool, and (2) unreasonable damage to underground fresh or mineral waters, natural brines, or other mineral deposits from operations for the discovery, development, and production and handling of oil or casing-head gas.

"(2) 'Surface waste,' as those words are generally understood in the oil business, and in any event to embrace (1) the unnecessary or excessive surface loss or destruction without beneficial use, however caused, of casing-head gas, oil or other product thereof, but includ-

ing the loss or destruction, without beneficial use, resulting from evaporation, seepage, leakage or fire, especially such loss or destruction incident to or resulting from the manner of spacing, equipping, operating, or producing well or wells, or incident to or resulting from inefficient storage or handling of oil, (2) the unnecessary damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil and gas operations; and (3) the drilling of unnecessary wells.

"(3) 'Market waste,' which shall embrace the production of oil in any field or pool in excess of the market demand as defined herein."

Sections 4 and 5 of the act speak only in general terms of waste, making it unlawful and within the authority and jurisdiction of the Supervisor of Wells; § 7 provides for a hearing before the advisory board "to determine whether or not waste is taking place or is reasonably imminent, and what action should be taken to prevent such waste;"[15] § 6 charges the Supervisor of Wells with prevention of "the waste prohibited by this Act" and enumerates his specific powers to deal therewith "after consulting with the (Oil and Gas Advisory) board."[16] Nowhere therein is the power to deny a drilling permit to prevent future waste mentioned or suggested, nor does § 23 dealing with the issuance of permits suggest such a power. Nor has the

---

[15] As already noted, there was no such hearing in this case.

[16] As already noted, there was no such consultation with the board in this case.

The specific powers granted as to waste, other than market waste, are:

1. The power to make and enforce rules and regulations. § 6(a).

2. The powers of recordkeeping and data compilation. § 6(b), (d), (n).

3. The power to require some operating practices and prevent others. § 6(c), (e)–(k).

4. The power to issue emergency orders suspending "any operation or practice and the prompt correction of any condition found to exist which is causing or resulting or threatening to cause or result in waste". § 6(l) (under § 16 emergency orders issued without hearing are valid only for 21 days).

Supervisor of Wells sought such a power by adopting rules and regulations which would so provide.

The act does recognize the risk of damage to water, mineral deposits, surface, soils, neighboring properties, life, or to animal, fish or aquatic life or property, from oil and gas operations and that the public interest warrants regulation to minimize such risk. Obviously such damages, and oil and gas exploitation in itself, have ecological significance. But nowhere in the act is the word "ecosystem" mentioned, nor "ecology", either in the definitions of waste or in other sections of the act dealing therewith or defining the powers of the Supervisor of Wells. It is significant that the Legislature has demonstrated that it can, if it chooses, express an absolute ecological or environmental standard. Thus among the powers conferred on the supervisor in § 6(c) is the power

"to prevent pollution, damage to or destruction of fresh water supplies including inland lakes and streams and the Great Lakes and connecting waters, and valuable brines, by oil, gas or other waters, to prevent the escape of oil, gas or water into workable coal or other mineral deposits".

But more typical of the act, and more realistic, is the following clause of § 6(c) giving the Supervisor of Wells the power,

"to require the disposal of salt water and brines and oily wastes produced incidental to oil and gas operations, in such manner and by such methods and means that no *unnecessary* damage or danger to or destruction of surface or underground resources, to neighboring properties or rights, or to life, shall result" (emphasis added).

In so stating the supervisor's power, the Legisla-

ture recognized the necessary risks inherent in disposing of salt water, brines and oily wastes and authorized regulation to minimize them so that no unnecessary damage should result. The Legislature has used a similar word, "unreasonable", in § 2(l)(1)(2) in describing subsurface damage as waste. So too, where dealing with production allocation and pooling, § 13 of the act declares the drilling of unnecessary wells to be waste since they create fire and other hazards conducive to waste; since such risks are common to all wells, it is the unnecessary risk with which the Legislature is concerned. The word "unnecessary" appears also in that portion of the statutory definition of surface waste upon which the commission here relies:

"(2) 'Surface waste,' as those words are generally understood in the oil business, and in any event to embrace * * * (2) the unnecessary damage to or destruction of the surface, soils, animal, fish or aquatic life or property from or by oil and gas operations"[17] § 2(l)(2).

And while, after this controversy arose, the Legislature has broadened this definition of waste by adding "other environmental values" to the interests to be protected from unnecessary damage or destruction,[18] it did not choose to delete the word "unnecessary" from the definition or to provide an absolute standard for the protection of environmental values as it had done in § 6(c) for the protection of fresh waters and mineral deposits.

The Attorney General's 1971 opinion to the then

---

[17] We would not suppose, and the commission has not suggested, that "surface waste" is generally understood in the oil business to include ecological changes from, or the frightening away of wild animals by, oil and gas operations.

[18] 1973 PA 61.

director of the DNR, followed by the hearing examiner, concluded that the act recognized that there was necessary damage or destruction consequent upon all oil and gas exploration and production and that what the act proscribed as unnecessary damage or destruction was that damage arising from careless or imprudent operations which might be prevented by appropriate precautions in such operations. That is the ordinary sense of the words "necessary" and "unnecessary", *i.e.,* that which is required or consequentially unavoidable versus that which does not follow as a matter of course and may be avoided.[19]

The circuit judge thought this dictionary definition of "necessary" and "unnecessary" to be too narrow, and that these were, instead, relative terms, saying:

"Whether or not damage is necessary * * * also concerns whether the oil itself is necessary, or whether the oil is so necessary that other values must be subrogated * * * the denial of the permit to drill could validly be based partially or entirely upon ecological considerations."

---

[19] The commission's conclusions of law avoided the question completely. It found factually (a) damage to the ecosystem; (b) serious *or* unnecessary damage to animals, and concluded "On considering the foregoing testimony the Commission must find that damage to or destruction of the surface, soils, animals, fish or aquatic life will occur", *i.e.,* using the exact language of the act deleting the word, unnecessary.

The argument of the commission on appeal makes no reference to the word "unnecessary"; rather, its brief in effect reads the word out of the statute and substitutes the word "serious", saying:

"the thrust of the (Attorney General's) opinion is aimed at the prevention of waste arising from careless and imprudent operations and damages that may be prevented by appropriate measures, and that, therefore, the appellant cannot be denied a permit.

"It is our position, however, that * * * (appellant's) activities in drilling and operation of the proposed well will cause serious damage to the elk, bear and bobcat which cannot be prevented by any 'appropriate measures.'"

This I hold to be an erroneous interpretation of the statute. It would give to the enforcing officer, the Supervisor of Wells, the power to define waste and to do so according to his relative assessment of the competing values of oil and gas production versus ecological or other considerations. He is given no such power by the act, nor has he ever claimed such by his administrative rules and regulations. The question of whether oil and gas production is "necessary" was affirmatively answered by the act itself, as, indeed, it was answered by the various acts of the Legislature authorizing the commission to select state lands for oil and gas leasing.[20]

Nothing in my view of the act, that the regulatory powers of the Supervisor of Wells is confined to the establishment and enforcement of prudent operating practices and safety standards for the prevention of avoidable damage from ongoing operations, is altered by an examination of § 23 governing the issuance of drilling permits. There is no suggestion therein that a determination of feasibility, ecological or environmental acceptability, or of improbability of future waste of any kind is a prerequisite for the issuance of a permit. To the contrary, upon receipt of the required fee, acceptable bond and an application in proper form, issuance of the permit appears mandatory except where the applicant has not complied with or is in violation of the act or the rules, regulations, requirements or orders of the Supervisor of Wells. While there are rules and regulations relating to permit procedures, I have already noted that there are none dealing with ecological or environmental

---

[20] Most recently 1921 PA 17, § 2; MCLA 229.2; MSA 13.2. The power to make the value determinations which concerned the circuit judge does exist in the discretionary power thus conferred on the commission to select state lands for oil and gas leasing.

concerns of authorizing denial of drilling permits
in anticipation thereof, nor are such concerns
mentioned in the statutory powers given the su-
pervisor to make requirements and orders.

I conclude that the damage to the ecosystem or
serious damage to animals which the commission
found would result from oil and gas operations at
Corwith 1-22 is not unnecessary within the statu-
tory definition of waste, and that there is no power
in the Supervisor of Wells under the statute to
deny appellant's application for a drilling permit
because of such anticipated damage.[21]

Moreover, while I think this construction of the
act is both evident and sensible, were the act
ambiguous I would be compelled to reach the same
result in order to preserve its constitutionality.

"We cannot properly hold that the Legislature de-
signed to commit such an act of injustice as to take
away vested rights and destroy valuable existing inter-
ests. We are bound, if possible, so to construe statutes
as to give them validity and a reasonable operation."
*Van Fleet v Van Fleet,* 49 Mich 610, 613; 14 NW 566
(1883).

The commission acknowledges that by the lease,
appellant acquired a valuable property interest. It
denies appellant's claim that the denial of a drill-
ing permit operates to deprive appellant of that
property without just compensation in violation of

---

[21] In passing, I note the reference in the commission's brief to the
Supervisor of Wells as an independent officer and am constrained to
comment that the handling of the Corwith 1-22 application does not
indicate that the commission or DNR director have so viewed the
office. Indeed, all briefs filed have referred to the supervisor, the DNR
and the commission interchangeably, as if they were the same.
Although the 1973 amendments to the oil conservation act now make
the DNR director the Supervisor of Wells, the powers vested in him
in the latter capacity belong to the office, not to the office of director
of the commission.

§ 2 of article 10 of our constitution; rather, it asserts, it is merely exercising a police power to regulate the use of that property. But it seems fatuous to argue that because the lease conveying the oil and gas rights will run until 1978, the denial of the right to explore for oil and gas does not destroy its value. The action of the supervisor, if authorized by statute, would deprive the lease of all value.

*Spanich v Livonia,* 355 Mich 252, 259–260; 94 NW2d 62 (1959), holding a zoning ordinance unconstitutional as depriving the affected parcel of land of any value for the zoned use,[22] delineated permissible police powers, saying "the legislation may only 'regulate'; it may not 'take' under the guise of regulation", citing *Arverne Bay Construction Co. v Thatcher,* 278 NY 222; 15 NE2d 587; 117 ALR 1110 (1938), which at 232 said:

"An ordinance which permanently so restricts the use of property that it cannot be used for any reasonable purpose goes, it is plain, beyond regulation, and must be recognized as a taking of the property."

Another case citing *Arverne* with approval was *Commissioner of Natural Resources v Volpe & Co, Inc,* 349 Mass 104, 110–111; 206 NE2d 666 (1965), like the instant case involving claimed powers for conservation of ecological values, which claimed powers were rejected in the following language:

"The plaintiffs argue as though all that need be done is to demonstrate a public purpose and then no regulation in the interests of conservation can be too extreme.

---

[22] *See also, Ervin Acceptance Co v Ann Arbor,* 322 Mich 404; 34 NW2d 11 (1948), *North Muskegon v Miller,* 249 Mich 52; 227 NW 743 (1929), *Kropf v Sterling Heights,* 391 Mich 139; 215 NW2d 179 (1974).

* * * An unrecognized taking in the guise of regulation is worse than confiscation."

Intervenors advance such arguments of public interest, citing *People v Broedell,* 365 Mich 201; 112 NW2d 517 (1961), dealing with the public trust in submerged lands. But the public trust imposed on the state's fee title to the submerged lands of the Great Lakes has no counterpart in other state owned lands which may be bought and sold, leased or dealt with as by any private owner, and the power to sell oil and gas leases is expressly conferred by statute. Appellant does not deny, nor does this Court, the public interest in conservation of valued ecological and environmental interests. That public interest would have warranted the commission in withholding lands in the Pigeon River State Forest from lease in the first instance had the commission found it appropriate to do so. That public interest warrants regulation of private property under reasonable standards[23] for preservation and development of such environmental interests. That public interest warrants the expenditure of public funds for such purposes. And that public interest justifies the use of the power of eminent domain where necessary to accomplish those purposes. But no man's property may be taken from him to achieve those purposes without just compensation.

In a case similar to the one at hand, *Union Oil Co of California v Morton,* 512 F2d 743 (CA9, 1975), a Federal lease for off-shore drilling with the right to erect a drilling platform had been sold

[23] For the necessity of such standards, *see Hoyt Brothers, Inc v Grand Rapids,* 260 Mich 447; 245 NW 509 (1932). The absence of such standards here would be another constitutionally fatal flaw were the statute to be construed as the commission contends, or were the commission to be viewed as holding such powers as the majority opinion seems to find.

to Union Oil Co. After one drilling platform
caused a serious oil spill in the Santa Barbara
Channel, an order of the Secretary of Interior
suspended drilling rights in the area and denied
Union the right to install another drilling plat-
form. In remanding to the District Court, the
Court made it clear that if the practical exercise of
the lease was being denied indefinitely, such action
of the secretary must be overturned. After noting
that the secretary had no powers of condemnation,
the Court said, at 750–751,

"If, as Union contends, platform C is a necessary means
for the extraction of oil from a portion of the leased
area, refusal to permit installation of that platform now
or at any time in the future deprives Union of all
benefit from the lease in that particular area. We
therefore conclude that an open-ended suspension of the
right granted Union to install a drilling platform would
be a pro tanto cancellation of its lease.
"Such a taking by interference with private property
rights is within the constitutional power of Congress,
subject to payment of compensation. * * * But Congress
no more impliedly authorized the Secretary to take the
leasehold by prohibiting its beneficial use than by con-
demnation proceeding. A suspension for which the fifth
amendment would require compensation is therefore
unauthorized and beyond the Secretary's power."

The contention that Union is distinguishable
from the instant case because appellant's lease
contained a provision that it was subject to future
rules and regulations applicable to such leases is
quite beside the point since the commission has
failed to demonstrate that there is any applicable
rule or regulation. It is a feeble effort to equate
the act of a governmental officer with a properly
adopted administrative rule or regulation; and if
they were identical, it would be nonetheless totally

destructive of the value of appellant's lease and an unconstitutional taking. That is the import of the decision of my brethren. See the opinion of BLACK, J., concurring in *Pigorsh v Fahner,* 386 Mich 508, 515; 194 NW2d 343 (1972), and speaking of the "enormity" of a like governmental position in a similar public interest case.

I would reverse and direct the issuance of a drilling permit pursuant to appellant's application, with costs to appellant.